## Lindsey Jones

*v.*

## The People of the State of Illinois.

*Filed at Mt. Vernon April 3, 1897.*

1. Criminal law—*proof of mere presence of defendant is not sufficient to convict.* Where parties are jointly indicted for murder, and the evidence shows that one did the killing in the other's presence, to justify the conviction of the latter it must appear, beyond a reasonable doubt, that he aided, abetted or assisted in the killing.

2. Same—*party passively assenting to homicide cannot be convicted of the crime.* One who is present at the time a homicide occurs, and passively assents thereto, cannot be convicted of the crime, where he does no act in aid of the killing.

3. Evidence—*what not sufficient to justify conviction for murder.* The testimony of a witness in a murder trial that one of the joint defendants said to him, shortly after the act, "You go home and we will get out of this by swearing a few lies," will not justify the conviction of such defendant, in the absence of other evidence connecting him with the crime.

Writ of Error to the Circuit Court of Alexander county; the Hon. Joseph P. Robarts, Judge, presiding.

Lansden & Leek, for plaintiff in error.

Mr. Justice Craig delivered the opinion of the court:

French Jones and Lindsey Jones were indicted in Alexander county for the murder of John Goskie on the 24th day of June, 1895. At the October term, 1895, of the circuit court of Alexander county the two defendants were tried on the indictment and both were found guilty. French Jones was sentenced to the penitentiary for the term of his natural life and Lindsey Jones was sentenced to the penitentiary for the term of fourteen years. French Jones died in the penitentiary, and this writ of error was sued out by the other defendant, Lindsey Jones.

Goskie, the deceased, married Althea Jones, a daughter of French Jones and a sister of plaintiff in error. The deceased and his wife separated about the 28th day of

March, 1895, and did not reside together after that time. After the separation the wife resided at Blodget, Mo., and Cairo, Ill., the most of the time, but she returned to her father's house four days before the killing. The deceased seemed, from the evidence, to entertain a bitter feeling against French Jones on account of the separation between him and his wife, although the evidence fails to disclose the fact that he had anything whatever to do with it. On the 6th day of June, 1895, the deceased told French Jones that he was going to kill him and "break up that damned nest." On the 22d day of June, 1895, he told Althea Goskie that he was going to blow French Jones' brains out the first time he met him. On the 23d day of June, 1895, he told plaintiff in error, who was going over to his brother-in-law's to stay all night, that when he came back in the morning he would not find his father's house standing. On the same day he told Henry Powless that he was going home and get his gun and go up to Jones' after the mare; that it looked as if somebody had to be killed anyway, and that he was going to get his gun and go up there and commence it. These threats were communicated to French Jones before the homicide. On the 23d day of June, 1895, the deceased told Raleigh Evans that Althea Goskie had taken his mare that day and that he was not going to put up with it any longer; that he was going there that night and fire the house, and when Jones came out he was going to shoot him; that he had so much trouble that he would about as soon be dead as alive. Other threats of a similar character were made. On the night of the 23d of June French Jones and plaintiff in error armed themselves with a gun and a pistol and went into the barn for the purpose of preventing the deceased from burning the house should he attempt to do so, as he had threatened. At about eleven o'clock that night the deceased and another man came to the barn lot, opened a gate and turned a number of horses into the road, but

made no attempt to fire the house. As they left they discharged their guns a number of times. French Jones remained in the barn during the night. The next morning he went to the house and ate his breakfast and then went to the barn to feed the hogs. About sunrise plaintiff in error, who was at the house, saw the deceased riding up the lane towards the house. He went out to meet him, and endeavored to keep him from going to the house. He warned the deceased not to go to the house, as he might have trouble. The deceased got down from his horse and made an attack on plaintiff in error, who drew a revolver, but the deceased took it from him and said: "You're not the boy I want. I want the man who is guarding the mare." The deceased then started for the barn. When he reached the small gate, French Jones, who was near the barn with his gun, said, "Don't you come in here, John." The deceased had a pistol, and remarked that he was coming. French Jones notified him not to come into the barn lot, and raised his gun and fired, killing the deceased.

In view of the threats which the evidence discloses were made by the deceased against French Jones, whether he was justified in killing the deceased in necessary self-defense is a question which it will not be necessary to determine, as he is not before the court. Lindsey Jones, and he alone, is complaining of the judgment of the circuit court, and the question is whether he is guilty in manner and form as charged in the indictment. The crime alleged in each count of the indictment is charged as the joint act of Lindsey Jones and French Jones; that French Jones and Lindsey Jones did unlawfully, feloniously and willfully, with malice aforethought, assault and shoot one John K. Goskie, and gave him several mortal wounds, of which he instantly died, etc.

At the time the shooting took place four persons were at or near where it occurred,—the two defendants, Althea Goskie and William Miller,—but no one except the

two defendants saw the shooting. At the time the gun was fired Althea Goskie was in the barn lot, milking, and Miller was in the barn and had stepped in a granary to get a single-tree, so that neither of them saw the shooting. Plaintiff in error, Lindsey Jones, who at the time was eighteen years old, in his evidence gave substantially the following account of the transaction: "I was on the front porch of my father's dwelling house at the time I saw him. When I saw Goskie coming I went down and met him. He was riding. I met him about that big gate that goes through the hallway, or a little east of the gate, if there is any difference. I asked him if he was coming after the mare, and he said: 'It is none of your damn business; you are putting in too soon; I will get down and thrash you a while.' Then he got down off his mare and started to catch me. I started to get out of his way and saw I could not, so I drew my pistol on him and he wrenched the pistol out of my hand and said, 'You're not the boy I want; I want the man that is guarding the mare.' He started to run up to the fence and I still held on to him. He went to the lot gate and unlatched the gate and stepped inside just as my father shot him. It was this little gate right here that I am pointing to on the map. It is the first gate after the turn of the lane. I told him not to go up to the house, as he might have trouble, and he said, 'I have a pistol and I will go.' He took my pistol away from me. When he went up to the gate my father said to him, 'Don't you come in here, John.' John said that he had a pistol and was coming, and he held his pistol up and father shot him. He unlatched the gate and stepped just inside the gate. After the shot was fired he ran to the mare, which was standing within a few feet of him, and tried to get on the mare. After he was shot he hollered three times very loud, 'Oh!' After my father had shot Goskie I went back down to that gate that went through the hallway and went through that before I went back to the house.

I got out of the barn lot by that little gate there, above the one he was shot àt. I went through the hallway into the lot, and then up to this gate indicated on the map. When I got up towards where the body was, Althea Goskie was there. No one got there before Althea, that I saw." The other defendant gave substantially the same account of the transaction. Althea Goskie testified: "I was the first person to get to John Goskie after he was shot. When I first reached him he had his revolver in his right hand. Immediately after I heard the report of the gun I ran down to where my husband was, I climbed the fence between the cow lot and the road. Nobody reached him before I got there. My brother, Lindsey Jones, came up next after I got there. My brother came to within about five or six feet of Goskie. No one came to him right then. I saw my father a short time after that. He came out of the horse lot."

There is no controversy from any quarter in regard to the fact that French Jones shot and killed Goskie, but, while Lindsey Jones was present, there is no evidence in the record that he aided, abetted or assisted French Jones, in any manner, in killing the deceased. In order to justify the jury in convicting plaintiff in error under the indictment, it should appear, from the evidence, beyond a reasonable doubt, not only that he was present when French Jones killed the deceased, but that he aided, abetted or assisted in the homicide. If plaintiff in error was present and assented to the homicide but did no act in aid of the killing, he could not be convicted under the indictment. The rule applicable to a case of this character is clearly laid down in *White* v. *People*, 81 Ill. 333. It is there, among other things, said (p. 337): "By the second instruction the jury are told that one who stands by when a crime is committed in his presence by another, and consents to the perpetration of the crime, is a principal in the offense, and must be punished as such. The law is, that one who 'stands by and aids, abets or assists    *    *    *

the perpetration of the crime' is an accessory, and 'shall be considered as principal,' etc. (Rev. Stat. 1874, p. 393, sec. 274.) There is a plain distinction between 'consenting' to a crime and 'aiding, abetting or assisting' in its perpetration. Aiding, abetting or assisting are affirmative in their character. Consenting may be a mere negative acquiescence, not in any way made known at the time to the principal malefactor. Such consenting, though involving moral turpitude, does not come up to the meaning of the words of the statute. The words of the statute are stronger than those of the instruction." But here there was no evidence that plaintiff in error even consented to the commission of the crime, but, on the other hand, the evidence tends to prove that he warned the deceased of his danger and attempted to prevent him from going to the barn lot where French Jones was, armed with a gun. William Miller, a boy seventeen years old, a hired hand of French Jones, who was in the granary when the shot was fired, did testify that after Goskie was shot and he was about leaving for home Lindsey Jones came to him and said, "You go home, and we will get out by swearing a few lies." Plaintiff in error, in his evidence before the jury, denied that he ever made the statement sworn to by Miller. Moreover, Miller was a witness before the coroner's inquest, when the transaction was fresh in his mind, and never intimated that plaintiff in error had made the statement. If plaintiff in error had made up his mind to conceal the evidence of the crime, it is unreasonable to believe that he would have disclosed his intention to Miller. But if the statement was made, in the absence of other evidence connecting plaintiff in error with the homicide it would not justify a conviction.

After a careful examination of the entire record we do not think the evidence sufficient to authorize a conviction, and the judgment will be reversed and the cause remanded.      *Reversed and remanded.*