## MARJORIE H. CROSBY
*v.*
## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed February 20, 1901.*

ACCESSORIES—*something affirmative in its nature is necessary to constitute one a principal.* The aiding or abetting contemplated by the statute concerning accessories, (Rev. Stat. 1874, p. 393,) which is necessary to constitute a mother a principal to the homicide committed by her son, consists in something affirmative in its nature; and even if she overheard the threats made by him, and knew he was likely to shoot but did not try to stop him, such fact is not sufficient to make her guilty as a principal.

· MAGRUDER, J., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. A. N. WATERMAN, Judge, presiding.

WILLIAM PRENTISS, for plaintiff in error:

The family had the right to defend the home from aggressors; and, when in the house, to exercise all needful force to keep the aggressors out, even to the taking of life. 1 Bishop on Crim. Law, (5th ed.) sec. 858, and cases cited; *Davidson* v. *People,* 90 Ill. 221; 1 Wharton on Crim. Law, secs. 465, 502, 503.

Defense of habitation is analogous to defense of person, or self-defense. The danger in a case of self-defense need not be real. If it is apparent to a reasonable person under the circumstances it is enough. So in a case of an attempt to forcibly enter a dwelling, if, under the circumstances, the attempt to enter was by persons apparently without legal right, the defense is justifiable, even to the taking of life. *Enright* v. *People,* 155 Ill. 32; *Davidson* v. *People,* 90 id. 221; *Cahill* v. *People,* 106 id. 621.

The mere presence of a party at the commission of a homicide, whether passive or constrained, is not sufficient to constitute him a principal. There must be something shown in his conduct which unmistakably evinces a design to encourage, incite, approve of, or in some

manner afford aid or consent to the act.   9 Am. & Eng.
Ency. of Law, 574; *Connaught* v. *State,* 1 Wis. 159; *Lamb* v.
*People,* 96 Ill. 73; *White* v. *People,* 139 id. 143; *Jones* v. *People,*
166 id. 264; *Usselton* v. *People,* 149 id. 612; *White* v. *People,*
81 id. 333.

At common law an accessory could not be tried until
after the conviction of the principal, etc.   In a sense,—
namely, as to the time of trial,—the distinction between
principal and accessory is by our statute abolished; yet
in the commission of crime, the one who actually does
the act is still the principal and the party who advises
or encourages the same is still the accessory.   Without
a guilty principal there can be no accessory.   1 Bishop
on Crim. Law, (5th ed.) secs. 666-668, 670; Wharton on
Crim. Law, (10th ed.) secs. 237, 238, and cases cited; *State*
v. *Mosely,* 31 Kan. 355; *Bowen* v. *State,* 25 Fla. 645; *Buck* v.
*Commonwealth,* 107 Pa. 486; *McCarthy* v. *State,* 44 Ind. 214;
*People* v. *Collins,* 53 Cal. 185; *State* v. *Sleeves,* 29 Ore. 93.

E. C. AKIN, Attorney General, (CHARLES S. DENEEN,
and BEN. M. SMITH, of counsel,) for the People:

If a person does an act that results in killing, what-
ever may have been his intent in the doing of the act, he
is responsible.   *Mayes* v. *People,* 106 Ill. 313.

Intent does not necessarily enter into the definition
of murder.   *Adams* v. *People,* 109 Ill. 449.

Mrs. Crosby was present at the time of the shooting,
and is guilty, not as accessory, but as principal.

A person might well be convicted of homicide if the
fatal blow was given by a person not named in the indict-
ment, provided he were present at or aided him, or, if
absent, advised and encouraged him in the doing of the
act.   *Brennan* v. *People,* 15 Ill. 517.

Accessories, under our statute, must be indicted as
principals, and if one strike a fatal blow and others were
accessory at the fact they all should be convicted as
principals.   *Coats* v. *People,* 72 Ill. 363.

If there is a common design to do an unlawful act in the contemplation of the law, the act of any one in the furtherance of the original design is the act of all, and all are equally guilty.  *Hanna* v. *People*, 86 Ill. 243.

Under the evidence in the case at bar there seemed to be a common design among at least the three members of the household to use a revolver in case an entrance was attempted to be forced.   In pursuance of that original and common design the shooting was done by one. Therefore the law would hold those in anywise encouraging or assisting in this act as principals.  *Spies* v. *People*, 122 Ill. 101; *Hamlin* v. *People*, 113 id. 38.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

In December, 1898, Marjorie Helen Crosby, plaintiff in error, occupied as her home the premises at 1529 Wilson avenue, in Chicago.   She was a widow, sixty-five years old, and lived there with her mother, who was eighty-nine years old, her foster sister, Nellie Strong, and her adopted child, Thomas G. Crosby, a boy thirteen years of age.   She had owned in her own right the premises, which consisted of a tract fronting 382½ feet on Wilson avenue and 194 feet on Clarendon avenue, with the dwelling house fronting north on Wilson avenue and about 75 feet distant therefrom.   She had mortgaged the premises in 1894 to the Lehman estate for $20,000, payable in five years, and the mortgage had been foreclosed for a default in the payment of interest, and the property had been sold August 6, 1897, to Augusta Lehman, conservatrix.   The time for redemption expired November 6, 1898, and a few days afterward the certificate of purchase was sold to Christian Kurz and the assignment was dated back to November 5, 1898.   Kurz obtained a master's deed of the premises, and tried in different ways and by various devices to get possession.   About the time he got the deed he visited the place with a real estate

dealer, who said to Mrs. Crosby that Kurz had bought the property. She disputed the statement, and claimed that the time of redemption had been extended two months by the attorney for the Lehman estate to enable her to raise the money and redeem her home. She was counseling with two attorneys at the time, and had been directed by them to keep possession. The doors were locked and the windows fastened. The fence was nailed up and a barbed wire fastened across the gate. One of the attorneys provided her with a chain, which was put on the front door, and every precaution was taken to protect the possession against Kurz, while every effort was being put forth on his part to get into possession. Men tried to get in under such pretext as inspecting the gas meter, although gas was not used in the house, and men were seen sneaking through the shrubbery after dark. The tenants of the house were greatly wrought up by this condition of affairs and were constantly on the watch to see that no one got in, and on one occasion they called the police to protect the property. Mrs. Crosby was going down to the city frequently, counseling about the matter and endeavoring to get a new loan. Finally, on December 7, 1898, Kurz obtained an order from the circuit court of Cook county for a writ of assistance to put him in possession, which was issued the next day. Some time after that, Frank E. Nye, a deputy sheriff of that county, who had the writ, came to the house and tried to gain admission. Nellie Strong answered him, and he said he wanted to see Mrs. Crosby and that he had an order from the court. He did not show an order or say what it was, or that he was an officer, but said that his name was Nye. He told Nellie Strong that the next time he came he was going to get in if he had to break through the side of the house. On the morning of December 22, 1898, said deputy sheriff, Frank E. Nye, got six men to aid him in executing the writ of assistance. They went to a blacksmith's shop

and got a bar of iron about three feet long and went to the place. Mr. Nye jumped over the fence and went to a door on the west side of the house and rapped and shook the door. He then went around on the east side, where there was a door and a bay-window looking out on the porch, and tried the door. The boy, Thomas G. Crosby, who was down in the basement fixing the fire, went upstairs, and as he went took a revolver from the top of the refrigerator. This revolver had been about the house, had belonged to Mrs. Crosby's husband and had been kept mainly by Nellie Strong. The boy had never used it and had never fired a pistol in his life. Nye demanded admittance, and the boy told him that his mother was not at home and refused to let him in. Nye replied that he had a gang of men there and that he had better let him in or he would break in. The boy answered that Nye had not got anybody there, and Nye said he would show him, and called to the others to come on. While Nye was talking he opened his coat and showed his star, with the word "sheriff" on it. When the men were called some of them jumped over the fence and others pushed the gate open, and they all came around the window with the bar of iron. Part of the glass in the lower sash had been broken out and the lower part of the window was boarded up with five or six boards. Nye again rattled the door and demanded of the boy to open it or he would break in. The boy told him if he did he would shoot. Nye then told the men that had the iron bar to break off the boards from the window. One of them began breaking off the boards with the bar, and when one board was torn off the boy presented the revolver between the boards and told them to get away from there or he would shoot. The men recognized the voice as that of a child or woman, and it had the characteristics of a child's voice. The boy attempted to fire, but the revolver merely clicked and did not go off. It was then withdrawn, and when the next board was knocked

off it was again presented and fired and Nye was killed. Mrs. Crosby was in the house at the time, in a room separated from the room where the boy was, by a curtain. They were jointly indicted for the murder of said Frank E. Nye and were tried in the criminal court of Cook county. The jury returned a verdict that the defendant Thomas G. Crosby, who fired the shot, was not guilty, and that the defendant Marjorie Helen Crosby was guilty of manslaughter, and her punishment was fixed at one year in the penitentiary. She was sentenced in pursuance of the verdict.

Plaintiff in error has assigned as error various rulings of the court upon the admission of evidence and in giving and refusing instructions, but we will confine ourselves to the question whether the evidence was sufficient to justify the verdict and judgment.

The only ground upon which Mrs. Crosby was charged with the alleged crime was that she aided, abetted or assisted Thomas G. Crosby in its perpetration, and the jury were instructed, as to her, upon that theory alone. The verdict of the jury was that the shooting of deputy sheriff Nye was not a criminal act on the part of Thomas G. Crosby, but that Mrs. Crosby was guilty of manslaughter, as having aided, abetted or assisted in such shooting. Thomas G. Crosby, who fired the shot, was shown by the evidence to be an unusually bright and intelligent boy of his age. He worked as an errand boy and studied at home, where his aunt, Nellie Strong, was his teacher. He attended Sunday school, where he had been librarian for more than a year. There was no controversy but that he knew good from evil and right from wrong, and that if the circumstances of the shooting constituted a crime he was guilty. There was no claim or defense that he was merely an innocent or irresponsible agent of his mother and not amenable to the law. There was no ground for such a defense and he was not acquitted for such a reason. The evidence showed that

he and his mother, Mrs. Crosby, were each of blameless life and reputation, and there was no valid ground for a distinction between them if the evidence had shown that they both participated in the act. Assuming, however, for the purpose of this decision, that the evidence would have justified the jury in finding the shooting to be a criminal act, Mrs. Crosby could only be held responsible for it upon evidence proving, beyond a reasonable doubt, that she aided, abetted or assisted in it. There was no evidence tending to prove that she had anything to do with the shooting, directly or indirectly, except certain alleged admissions when she was under arrest. The facts above detailed were proved at the trial and were not controverted. Mrs. Crosby was in the adjoining room but was where she could not see the boy. She was keeping out of sight as she had done before and as she says she had been told to do—not to let any one serve a writ on her. Both she and Thomas denied, in their testimony, that she had anything to do, directly or indirectly, with the shooting, or that she even knew that Thomas had the revolver. She certainly did not say or do anything at the time. Thomas and the men were on opposite sides of an open window, within a few feet of each other, where the men could have heard, as well as Thomas, if Mrs. Crosby had said anything, and there is no evidence from any of them that she spoke or took any part in the affair.

The facts relating to Mrs. Crosby's connection with the transaction, as presented to the jury in her behalf, were substantially as follows: She had owned this place, and her husband had been in the marine insurance business as one of the firm of McDonald, Crosby & Rardon. The firm was involved, and in 1891 her husband appealed to her for help to raise money to be put into the firm. She mortgaged this home for $14,000 and raised the money required. The following year her husband died. She could not pay the interest on the mortgage, and it grew in size and was replaced by the mortgage for $20,000

to the Lehman estate. She had sued McDonald and
Rardon for the amount originally borrowed under the
mortgage and obtained judgment against them for about
$18,000, but they appealed from the judgment and her
only hope for immediate relief was to get another loan.
She was making every effort to do that, and a very clear
preponderance of the evidence shows that the attorney
of the Lehman estate had made an arrangement with her
and her attorney for two months' extension of the time
to redeem, and with notice to her if he should find a pros-
pective purchaser. After he sold the certificate to Kurz
he notified Mrs. Crosby and her attorney of the fact.
Mrs. Crosby's attorneys then gave her directions to hold
the possession, and one of them gave her the chain, and
she was advised that if she could raise the money within
the time she could enforce the agreement. On the day
before the shooting one of her attorneys wrote her a
letter, saying that a deputy sheriff had come to him and
showed the writ of assistance; that he had always told
her no one could take possession unless they had a writ
from the court; that this put a different phase on the
situation, and that she had better come down to see him
right away or else they would take steps to get posses-
sion by force under the writ. She went to see the attor-
ney in response to the letter, and he told her that the
writ altered the situation. She told him that she had
not been served with any writ, and went to see her other
attorney. An appointment was made by them to see the
attorney who wrote her the letter, the next morning at
half-past nine or ten o'clock. The next morning when
Nye and his men came to the house she was preparing
to go down to the city to keep that appointment. She
insists that her attorney had told her before that time,
during the troubles, that she had a right to protect her
possession of the premises by every means, even to the
use of firearms. The attorney qualifies the statement
somewhat, but it is very clear from the evidence and his

letter of the 21st that he had given her to understand, before the writ was issued, that she must retain possession by resistance. She and Nellie Strong talked over at the table, in the presence of Thomas, the direction and advice which they say they received from the attorney that they had a right to resist to the extent of using firearms. Thomas undoubtedly got the idea, from their talk, that it would be right to defend the property by the means finally employed, but they were only talking about their rights, and no advice, order or direction whatever was given to him,—and this was all before any writ was issued. He had never fired a pistol and had never had this revolver but once, when he was told to put it down. At the time of the shooting Mrs. Crosby was in a desperate situation and was trying to retain possession of her home, hoping to have the money to redeem it before the extension would expire, which would be in about fifteen days. She undoubtedly heard what the boy said when he was threatening to shoot, but the evidence does not justify a belief that she regarded it as anything but a threat. It is unreasonable to suppose that if she had any intention to have somebody shot, she would have entrusted the execution of her purpose to a little boy who had never fired a pistol in his life. Immediately after the shooting the boy got out of the house, by her direction, to telephone for the police, telling them that men were trying to break into the house.

The only evidence which it is claimed charges Mrs. Crosby with aiding, abetting or assisting in the killing of Nye rests upon her statements when under arrest, immediately after the shooting. When she and the boy were arrested she was greatly excited, and her talk was mainly about her right to protect the possession of her home. She told of her troubles and her distress and need and the advice of her lawyers, and said, in substance, that the boy was not to blame; that he was as innocent as a babe, and that if any one was to blame she was,

She was naturally frightened at what might be the punishment of the child, and told the officers that she had had him since he was two months old; that he was a good boy and an obedient boy; that the lawyers had told her not to open the door for any one and to shoot the first one that came in, and that if any one was to blame she was. She had talked over this advice and their rights before the boy, and with her motherly feeling for him she was ready to take the blame upon herself, and said, in substance, that if any one was to be punished she ought to be instead of him. One witness puts it a little stronger, and says that when the officers were putting Mrs. Crosby and the boy into the patrol wagon he heard her say: "Yes, it was the boy fired the shot. He done just as I told him." This man did not hear the remark to which she replied, and others, who were in a better position to hear her, say that she said the boy did the shooting but she was responsible for it. Again, the witness in question testified at the coroner's inquest, where he says he related all that was done and all that was said at the time, and counsel for the People admit that he did not relate any such statement as made by her. He evidently did not correctly understand or does not recollect what was said.

The evidence goes no further than to show that Mrs. Crosby and Nellie Strong had talked over, in the presence of the boy, the advice they said they had received from their attorneys, and that at the time of the shooting Mrs. Crosby heard the threats made by the boy. There was no evidence that she directed, incited, aided, abetted or assisted in any manner in the shooting. Her mere presence in the adjoining room, out of sight of the boy, where she neither said nor did anything, was not sufficient to constitute her a principal. The aiding or abetting contemplated by the statute consists in something affirmative in its nature, and even if it can be said that Mrs. Crosby knew, from the threats of the boy, that

he was likely to shoot and did not try to stop him, that would not have been sufficient to make her guilty as a principal. *White* v. *People,* 81 Ill. 333; 139 id. 143.

We think the evidence fails to connect Mrs. Crosby with the killing by the degree of proof which the law demands, and at best shows no more than a negative acquiescence or silence on her part, which would not justify her conviction as a principal.

The judgment of the criminal court is reversed and the cause is remanded.    *Reversed and remanded.*

Mr. JUSTICE MAGRUDER, dissenting.