**People of the State of Illinois, Appellee, v. Manuel Ramirez, Appellant.**

**Gen. No. 51,859.**

First District, Fourth Division.

March 27, 1968.

Julius Lucius Echeles, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James A. Stamos, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

CRIME CHARGED
Murder.

JUDGMENT
After a jury trial, the defendant was found guilty and sentenced to a term of 14 to 20 years.

CONTENTIONS ON APPEAL
(1) The evidence was insufficient to establish defendant's guilt.
(2) The prosecutor made prejudicial arguments to the jury.
(3) The court erred in instructing the jury.
(4) The totality of the circumstances surrounding the taking of an unsigned statement by defendant demonstrated a violation of his constitutional rights.

EVIDENCE

*Dr. James W. Henry,* for the State.

He was the chief pathologist for the Coroner of Cook County. He examined the remains of decedent (Julio Fazio) on October 18, 1965. Death was caused by asphyxia from suffocation, which, in turn, could have been caused by the gag in decedent's mouth. In his opinion, it was difficult to determine the time of death because of the body's having been in the water. It could have been there for as long as three days. Death could have occurred at a location other than the quarry (referred to by other witnesses).

*William Mitchell,* for the State.

He was a Sheriff's detective who helped raise the corpse from the water in Lemont quarry on October 17, 1965. The hands and feet were bound with wire. A piece of cloth tape secured a man's sock in the mouth of the corpse.

At about 2:30 p. m. on October 19, Mitchell and Sgt. Harmon went to the apartment of Robert Bradford. Bradford, defendant, and two women were in the apartment at that time. Wire, similar in appearance to the wire which bound the body, was found in the apartment, and it was learned that the wire belonged to Bradford.

Bradford was taken to the police station. Although not arrested, defendant was asked to go along to the station. Defendant, accompanied by the two women, complied with this request.

*Jerome Harmon,* for the State.

He was a Sergeant in the Sheriff's Police on October 19, 1965, when he and two other officers were admitted to Bradford's apartment. His testimony substantially corroborated Mitchell's description of the events occurring in Bradford's apartment on the occasion of the officers' visit.

Defendant arrived at the police station at 3:00 or 3:30 p. m.[1] He remained in the waiting room until about 1:30 a. m., when he was informed that he was under arrest. Defendant was allowed to phone a lawyer and a member of his family. His lawyer told defendant that he was not to say or sign anything. The interrogation of defendant was continued until 4:00 a. m., when he was charged with murder.

*Robert Ericson,* for the State.

He was a Sheriff's detective on October 20, 1965. At 12:30 a. m., he and Detective Repiczak talked to defendant in the police station. At 1:15 or 1:30 a. m., the interview was interrupted to inform defendant that he was under arrest and to allow him to call his lawyer and his family, which he did. Ericson identified an unsigned, typed statement as one which he typed to record an oral statement made by defendant. The statement was typed at about 4:00 a. m. (The statement was also identified by Mitchell and Repiczak, and was admitted into evidence.)

*George Repiczak,* for the State.

He substantially corroborated Ericson's testimony, and testified that defendant's oral statement was made in his and Ericson's presence at about 2:30 a. m.

*Unsigned, typed statement identified by the police officers as having been made by defendant.*

"Between 3:30 A. M. and 4:00 A. M. [October 14, 1965] Judy and I arrived at Rob's apartment, knocked at door, Bob Bradford came out to the hallway and I ask if we could stay, he said 'You're welcome to stay, but there's a problem.' He said, 'I have someone tied

---

[1] At this time defendant was asked to make and sign a statement, which he did. This signed statement, in which defendant denied that he had ever seen the decedent, was held inadmissible. No reference to it was allowed in the jury's presence.

up.' He said he didn't want us to get involved. I told him, 'Well we were tired and we just wanted to lay down somewhere.' So he said alright come in. We went into the kitchen and Kay and Bruce were sitting at the table drinking. We went and sat down and started drinking. Bob said that his wallet was missing and that the fellow in there knew where it was. I told him I didn't want to know anything about it. We stayed talking about my being in the House of Correction. About 5 minutes Judy passed out at the table. I asked Bob if it was alright if I layed her down. He said it was alright so I carried Judy in the front room and laid her on the couch. I seen a man sitting under the window tied. I went back to the kitchen, we talked a little more, then I went in and laid down with Judy. I went to sleep.

I woke up in the afternoon, Judy, Kay and Bob were there. We just stood there till late at night. I asked Bob what he was going to do with that fellow. He said he was going to get him out that night. He asked me to help him. I told him what did he mean help him and he said help him get him out of the house. I told him no I wouldn't. He said just come with him for a drive. Sometime early Friday morning [Oct 15] Bob carried Julio downstairs, front stairs, and put him in the car. He carried him across his shoulders. He came back upstairs and told me that he was ready to go. We got in the car and left. Bob was driving, I was sitting in the front on the right and Julio was laying on the floor of the car in the rear. His head was on the right side of the car. We drove west on 87th Street till it ended. We turned right on to a divided highway. We didn't go too far then we came to another red light, the first one I think, we turned left, went a little ways and

408

went over a hill, kept going on that street, under a viaduct, over an expressway, the road narrowed to two lanes, passed through a small town, on the left side was some construction, continued on this road, through a heavy wooded area, went on till we came to an intersection and turned left, crossed over a big steel bridge, shortly after that he dropped me off at a tavern. I didn't have any money so he gave me some and told me to wait there. I went into the tavern and had a beer. I drank my beer and went outside. They closed shortly afterwards. I waited there till Bob came back, about an hour and a half. When Bob came back I got in the car. I looked in the back seat and the man who had been tied up was not there. Bob didn't say anything. He just drove around. He looked like he was in a daze. We returned to his house about 7:00 A. M."

*Manuel Ramirez*, defendant.

Defendant denied the charges against him. He denied ever seeing anyone bound or gagged in Bradford's apartment. Also, he denied making the oral statement identified by the police officers as having been made by him, and said that it did not speak the truth. Defendant did admit having been at Bradford's apartment from October 14 until Bradford's arrest on the 19th.

OPINION

██ The fact of Fazio's death and the fact that it was caused by the criminal agency of someone are clearly established by the evidence. However, in order to sustain the conviction of this defendant (who was not shown to have performed the killing), the State must also have adduced sufficient evidence to prove beyond a reasonable doubt that defendant is legally accountable for the

409

murder.[2] The State correctly notes that the oral statement quoted above, which defendant denies having made, is the only evidence adduced in support of the State's accountability theory.

■    In order to bring an accused within the purview of the statute, three propositions must be established: (1) that he solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) that this participation on his part must have taken place either before or during the commission of the offense; and (3) that it must have been with the concurrent, specific intent to promote or facilitate the commission of the offense. The issue here presented on review, therefore, is whether the oral statement, taken as true, supplies the facts necessary to satisfy these three requirements beyond a reasonable doubt.

First, as to the time element. The only evidence tending to establish the time of death is the pathologist's testimony that death could have occurred as long as three days before his examination of the body. There is nothing in the record which establishes affirmatively that the decedent was alive at any time when defendant was present—no conversation, no moans, no struggling, no movement of lips or of eyes, or of any kind whatsoever. Thus, the State has failed to show that the conduct on the part of defendant, which it claims was sufficient to prove accountability, took place either before or during the commission of the murder.

■■    The statute also makes it clear, we think, that the legislature did not intend to establish criminal re-

---

[2] The State bases its case on the theory of accountability pursuant to Ill Rev Stats (1965), c 38, § 5–2, which provided, in part, that "a person is legally accountable for the conduct of another when: . . . (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

sponsibility simply through guilt by association—a thoroughly discredited doctrine. Uphaus v. Wyman, 360 US 72, 79, rehearing denied 361 US 856. Mere presence at the commission of a crime is not culpable. People v. Barnes, 311 Ill 559, 143 NE 445; People v. Cione, 293 Ill 321, 127 NE 646; Crosby v. People, 189 Ill 298, 59 NE 546; People v. Bracken, 68 Ill App2d 466, 216 NE2d 176. A strict definition has evolved the case law for the type of conduct to which the language "aid and abet" may properly be applied. See, for example, People v. Barnes, 311 Ill 559, 143 NE 445. Even consent, though involving moral turpitude, does not constitute aiding or abetting. Jones v. People, 166 Ill 264, 46 NE 723. See, also, People v. Womack, 73 Ill App2d 317, 219 NE2d 592.

The cases cited by the State are distinguishable on the facts. People v. Johnson, 61 Ill App2d 319, 210 NE2d 344; People v. Richardson, 32 Ill2d 472, 207 NE2d 478; People v. Clark, 30 Ill2d 67, 195 NE2d 157. People v. Bracken, 68 Ill App2d 466, 216 NE2d 176 is also distinguishable.

On the other hand, and factually analogous to the present case, is the opinion in People v. Shields, 6 Ill2d 200, 207, 127 NE2d 440, in which the court reversed a conviction on the ground that there had been no proof of any affirmative conduct of aiding or abetting the commission of the crime.

■ Finally, the State had the burden to prove the specific intent to promote or facilitate the commission of the murder. In this, too, it failed, as there is no evidence showing beyond a reasonable doubt that defendant shared the criminal intent of the principal, or that there was a community of unlawful purpose. And this is the type of intent necessarily present when one aids or abets. Johnson v. U. S., 195 F2d 673, 675. See Nye & Nissen v. U. S., 336 US 613, 619; U. S. v. Alexander, 219 F2d 225 (7th Cir); U. S. v. Peoni, 100 F2d 401, 402.

■    In view of the conclusions which we have ex-
pressed above, it becomes unnecessary to discuss the
other errors assigned by defendant.

The judgment of the Circuit Court is reversed.

Reversed.

McCORMICK, P. J. and DRUCKER, J., concur.