THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HOMER MARQUIS, JR., Defendant-Appellant.

(No. 73-21;

Third District—December 23, 1974.

Thomas Durkin, of Ackerman, Durkin and Egan, of Chicago, for appellant.

Martin Rudman, State's Attorney, of Joliet (William McMenamin, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

Defendant was found guilty in the Circuit Court of Will County of aiding in the delivery of a controlled substance weighing 200 grams or more and of possession of a controlled substance weighing less than 200 grams. He was tried by the court without a jury and was sentenced to a term of 4 to 6 years on the delivery charge, and from 1 to 5 years on the possession charge, sentences to run concurrently.

On February 23, 1972, an agent of the Illinois Bureau of Investigation, Joseph Gryz, made contact with one Allen Kadlec to purchase 4,000 amphetamine tablets. Kadlec had made two prior sales of amphetamines to the agent Gryz. Arrangements were made for the sale to take place the following day.

In preparation for the event the Illinois Bureau of Investigation agents dusted $500 in currency with fluorescent powder and recorded the serial numbers of the bills. Gryz and six other Illinois Bureau of Investigation agents went to Kadlec's home and while Gryz entered the building the other six set up surveillance teams around the home. Gryz entered the home and was advised by Kadlec that he would have to get the pills. Kadlec was then observed leaving the home and driving his van across the street to defendant's residence and returning to his home in about 5 minutes. The Marquis home consists of a main house with a breezeway which annexes to a converted garage. Kadlec was seen entering the converted garage but the agents were unable to see if anyone was in defendant's residence or whether Kadlec carried anything out of the home. After Kadlec returned to his home he gave agent Gryz a sack that, as it was later proven, contained amphetamines and Gryz gave Kadlec $460 of the dusted money. After Gryz left, Kadlec was observed leaving his home and driving back to defendant's home. Three agents, including Gryz, approached the door to the garage annex. One of the agents, Thomas Petersik, testified that when he approached the garage annex

the defendant opened the door and asked what he wanted. He testified that he advised defendant that he was an agent for the Illinois Bureau of Investigation and told him to return to the room. He further advised defendant that he was under arrest for aiding in the delivery of a controlled substance.

The testimony shows that as the agent entered the room Kadlec was seated on a bed with a sum of currency lying on the bed alongside of him. One of the agents arrested Kadlec and took possession of the money, and Kadlec was taken to the center of the room where the defendant was standing. Another agent then shone the ultraviolet light on the hands of both defendant and Kadlec, and the hands of both men showed traces of fluorescent powder. Of the $540 that the agent had taken from Kadlec, $460 proved to be the prerecorded money delivered by Gryz to Kadlec, the other $80 being the funds of Kadlec. Agent Gryz told the agent that $40 was missing and the agent then conducted a search of the room. The agents found a plastic bag containing amphetamines under the bed in the room. It developed later that Gryz had paid $460 for the amphetamines and that he still had $40 of the dusted money in his possession.

Defendant contends that the discovery of fluorescent powder on his hands resulted from an unlawful arrest not based on probable cause and that this evidence should have been suppressed. The evidence established that at the time of the arrest of the defendant the agents were aware of certain facts. First, that Kadlec, when approached by Gryz, stated he had to get the amphetamines and that he then proceeded to the defendant's home. Second, that he returned from the defendant's home and made delivery of the pills to agent Gryz, although it is not observed that Kadlec was carrying anything. That after the sale Kadlec immediately proceeded to the defendant's home. Third, that when defendant opened the door the agents observed Kadlec sitting on the bed in possession of a quantity of money and that money had been delivered to Kadlec in payment for the amphetamines.

An arrest without a warrant is lawful if a criminal offense has in fact been committed and the arresting officer had reasonable grounds to believe the person arrested committed it. Ill. Rev. Stat. 1967, ch. 38, par. 107—2(c); *People v. La Bostrie*, 14 Ill.2d 617, 153 N.E.2d 570; *People v. Boozer*, 12 Ill.2d 184, 145 N.E.2d 619; *People v. Doss*, 44 Ill.2d 541, 256 N.E.2d 753.

In *People v. La Bostrie* the court said at pages 621-22:

"The great difficulty in all such cases lies not in determining the rule of law which is applicable, but in applying the law to the facts of each case. In particular, the problem narrows down to a

decision of whether or not the arresting officer had reasonable grounds to believe that the person arrested had committed a criminal offense. A completely satisfactory definition of what constitutes reasonable cause is impossible to formulate, for the question must find its resolution in the facts and circumstances of each case. [Citations.] However, certain principles emerge from the many cases which have considered this problem. First, it can be stated that 'reasonable cause' means something less than evidence which would result in conviction. * * * It is also established that reasonable cause may be founded upon evidence that would not be admissible at the trial. [Citations.] Specifically it has been held that reasonable cause may be founded upon hearsay evidence. [Citations.] In determining whether reasonable cause exists in a particular case courts deal with probabilities and are not disposed to be unduly technical; rather, they act upon 'the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act.' [Citation.] The test is whether a reasonable and prudent man in the possession of the knowledge which has come to the arresting officer, would believe the person arrested is guilty of a criminal offense."

■■ Defendant cites *People v. Galloway*, 7 Ill.2d 527, 131 N.E.2d 474; *People v. Moncrief*, 131 Ill.App.2d 770, 268 N.E.2d 717, and *United States v. Di Re*, 332 U.S. 581, 92 L.Ed. 210, 68 S.Ct. 222. Each of these cases can be distinguished on the facts from the case at bar. Under the facts and circumstances in this case we believe that the arresting officers had reasonable cause to place the defendant under arrest and the right to make an examination of him to ascertain whether he in fact handled the bills.

Defendant next contends that this evidence, the amphetamines found in his home, was the product of a warrantless search and that the search could not be justified as an incident to the arrest and that the evidence should have been suppressed.

■■■ A search that is incident to a valid arrest is an exception to the general rule that there must be a prior judicial approval of a search by the issuance of a warrant. (*Coolidge v. New Hampshire*, 403 U.S. 443, 45, 29 L.Ed.2d 564, 91 S.Ct. 2022; *Katz v. United States*, 389 U.S. 347, 356, 19 L.Ed.2d 576, 585, 88 S.Ct. 507.) The authority to conduct a warrantless search has been narrowly circumscribed. In *Chimel v. California*, 395 U.S. 752, 23 L.Ed2d 685, 89 S.Ct. 2034, the Supreme Court reviewed the history of search and seizure and gave further meaning to the rule of law that provides that a search incident to arrest must be a reasonable search for the purpose of discovering weapons which might

be used in order to resist arrest or effect an escape, or in order to prevent concealment or destruction of evidence. The Supreme Court said:

> "There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might be in possession of a weapon or destructible evidence." (395 U.S. 752, 763, 23 L.Ed.2d 685, 694.)

The Supreme Court further stated:

> "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." 395 U.S. 752, 763, 23 L.Ed.2d 685, 694.

Defendant cites *People v. Machroli*, 44 Ill.2d 222, 254 N.E.2d 450. There the court said:

> "A search incident to an arrest is authorized when it is reasonably necessary to protect the arresting officer from attack, to prevent escape, or to discover the fruits of a crime. *People v. Burnett*, 20 Ill.2d 624; *Chimel v. California*, 395 U.S. 752, 23 L.Ed.2d 685.
>
> The box and its contents were in no way related to the offense for which the defendant was arrested. * * * [W]e see no justification other than curiosity for the officer's conduct in entering the bedroom after the defendant had left it and taking possession of the box."

There the police entered defendant's room and effected an arrest on a charge of aggravated battery. Defendant was found on the floor clad only in shorts and a T-shirt. The police then handed defendant his clothing and observed that he had removed a small box from the trousers and placed it on the dresser. He was removed from the room and thereafter an officer returned and opened the box and discovered that it contained pills that were later found to be narcotics.

In *People v. Tillman*, 1 Ill.2d 525, 116 N.E.2d 344, the police entered defendant's apartment on a tip from an informer that defendant had made a sale of narcotics. They found defendant asleep on the bed, and after making certain identification and the arrest of the defendant, the officer raised the mattress and found a box containing 95 capsules of heroin. There the supreme court stated:

> "A long line of decisions which interpret both the Federal and State constitutions have established the proposition beyond con-

tradiction that the search without warrant of the person and of the vehicle or place where the arrest is made and which is under the control of the accused, subsequent and incident to a lawful arrest, in order to find and seize things connected with the crime or its fruits, or as the means by which it was committed, is lawful and not a violation of the accused's constitutional rights." 1 Ill.2d 525, 529.

In *People v. Williams,* 57 Ill.2d 239, 246, 311 N.E.2d 681, the supreme court reviewed the cases involving search and seizure and stated:

"These cases make it clear, we think, that there can be no hard and fast rule defining the permissible scope of a warrantless search incident to an arrest. Certainly an arbitrary limitation to a certain number of feet would be unsatisfactory. Whether the search is reasonable must depend on the particular facts of the case."

In the case at bar the arrest stemmed from a charge involving narcotics and a search was conducted within an area within the immediate control of the defendant and, as previously noted in this opinion, in the process of making a valid arrest.

■■ A examination of all of the evidence leads us to the conclusion that the lower court did not err in denying defendant's motion to quash this evidence.

■■ Defendant next contends that the court improperly considered certain evidence in arriving at its decision. This contention is without merit. While the lower court permitted certain evidence to come in regarding Kadlec's conduct in two prior sales of narcotics to agent Gryz, and while it is true that there was no evidence connecting the defendant in any way with each of these sales, we feel that from an examination of the entire record there was ample testimony to sustain the conviction. For example, Kadlec's use of defendant's home to store the narcotics; his return to the home immediately after the sale; the handling of the funds by the defendant; the presence of other and similar narcotics in the home. It must be remembered that the case was tried by the court without a jury, and it is presumed that the judge considered only competent evidence. (*People v. Frenchwood,* 28 Ill.2d 139, 190 N.E.2d 767.) Cases cited by the defendant in argument on this point are not controlling.

One count of the indictment charged the defendant with aiding in the sale of a controlled substance weighing 200 grams or more, the other charged him with possession of a controlled substance weighing less than 200 grams. Defendant contends that the evidence consisting of the amphetamines in each case were handled in a careless manner—that

they could have been commingled. Therefore a conviction based upon the delivery of over 200 grams with its enhanced penalty may not stand.

The testimony of agent Gryz was that he weighed the substance taken from Kadlec shortly after the arrest and found it to be approximately 225 grams, which weight included the plastic bag containers. On cross examination it developed that the bag containing the amphetamines carried the notation "8 ounces more or less." Gryz on cross examination could not recall if a gram scale or ounce scale was used in weighing the substance. The substance was again weighed by the crime lab and a criminalist testified that it weighed 221.26 grams including the plastic bags and that the plastic bags weighed 0.08 grams each and the pills alone weighed 215.7 grams. She further testified that 16 of the pills were used in the making of the test. The weight of the amphetamines involved in the second count of the indictment was 23.30 grams.

The witness, an employee of the crime laboratory, testified that she removed the amphetamines from the vault at the crime laboratory and commenced testing them. The exhibits involved were in separate sacks and identified as to each count of the indictment, and she was working with both groups of evidence. Before she could conclude the test her work day ended, and she placed the amphetamines in her desk with one group being placed on top of the other. Her recollection of the event is not totally clear, but there is no testimony indicating that there was a commingling of the exhibits involved in both counts.

The desk was not locked but the laboratory in which she was working was kept locked and the person who last used the laboratory at the end of the day would see to it that it was locked. She had no recollection if she was that last person on the day in question. She further testified that some 25 criminalists had access to the room as did the maintenance man who worked the same shift as she did.

From the foregoing the defendant contends that this testing raised a definite possibility that the amphetamines involved in the two indictments could have been commingled, thus increasing the amount contained in the evidence charging the defendant with aiding in the sale of the amphetamines. That by reason of this possibility defendant contends that the conviction as to Count I should not be permitted to stand.

Defendant cites *People v. Cain*, 35 Ill.2d 184, 188, 220 N.E.2d 195. There the court stated:

"The rule is of course well established that the State has the burden of showing a continuous chain of possession, in order to establish a foundation for admission into evidence. (*People v. Anthony*, 28 Ill.2d 65.) However, a rule requiring not only that

continuity of possession be established, but also that there be positive identification by everyone concerned, would impose an unnecessary burden, while it would not assure a fair trial to the accused. (*People v. Collins*, 25 Ill.2d 302, 305; *People v. Judkins*, 10 Ill.2d 445, 448.)

In *People v. Resketo*, 3 Ill.App.3d 633, 279 N.E.2d 432, also cited by defendant, there was a total lack of proof that the narcotics analyzed by the laboratory were the same found in the possession of the defendant. *People v. Brown*, 3 Ill.App.3d 879, 279 N.E.2d 382, *People v. Maurice*, 31 Ill.2d 456, 202 N.E.2d 840, and *People v. Woessner*, 132 Ill. App.2d 58, 268 N.E.2d 508, are also sufficiently different on the facts from the case at bar to be of any help to the defendant.

In *People v. Richards*, 120 Ill.App.2d 313, 256 N.E.2d 475, the testimony showed that a blood sample used in the conviction of the defendant was put in a freezer at a hospital and left there for some 17 days before delivery to the coroner without showing that the freezer was locked or otherwise secured and without evidence to show that only authorized personnel had access to the freezer. The evidence indicated that the container holding the blood sample was properly sealed. The court held:

> "There being an absence of any suggestion as to tampering, alteration or substitution in the record, we belive that the chain of custody was sufficiently proved. The People v. Washington, 41 Ill.2d 16; 24, 241 N.E.2d 425 (1968); The People v. Anthony, 28 Ill.2d 65, 68, 69, 190 N.E.2d 837 (1963); The People v. Harper, 26 Ill.2d 85, 91, 185 N.E.2d 865 (1962), cert den 372 U.S. 966." 120 Ill.App.2d 313, 340.

■■ From an examination of the record it does not appear and in fact counsel for defendant does not contend that there was proof of substitution, alteration or other form of tampering. Defendant's contention merely is that the testimony indicated careless handling and that through such carelessness the pills could have been commingled. We cannot agree that the record bears out this contention. The rule that an object must be in substantially the same condition when offered in evidence as it was when the crime was committed does not require the prosecution to exclude all possibility that the article may have been tampered with; rather, the court must be satisfied that in reasonable probability the article has not been changed in any important aspect. (*People v. Greer*, 28 Ill.2d 107, 190 N.E.2d 742; *People v. Wrona*, 7 Ill.App.3d 1, 286 N.E. 2d 370.) We do not believe that an inference of commingling of the amphetamine can be inferred from the testimony of the criminalist.

Defendant's next contention is that his conviction for aiding in the sale of a controlled substance was not based on proof beyond a reasonable doubt. Both sides concede that the conviction is based upon the accountability section of the Criminal Code, most specifically subsection (c) (Ill. Rev. Stat., ch. 38, par. 5—2(c)). That section provides as follows:

> "5—2. When Accountability Exists.) A person is legally accountable for the conduct of another when:
>
> &ast; &ast; &ast;
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. &ast; &ast; &ast;"

To again briefly summarize the testimony it is noted that Kadlec left all of the amphetamines with the defendant and advised the defendant that the sack he was leaving with him contained "speed." That on the following day he advised agent Gryz when the latter was attempting to make the purchase that he had to get the amphetamines and proceeded to defendant's home. While there he removed from the sack the greater portion of the amphetamines in the presence of the defendant and left the remainder in defendant's possession. Kadlec then proceeded to make the sale to Gryz and immediately thereafter returned to the home of defendant. The two, Kadlec and defendant, were then observed seated on the bed with the money between them and defendant's hands showed the presence of the fluorescent powder indicating that he had handled the funds. The testimony further indicates that as the agent entered defendant's home, defendant waved his hand behind his back to Kadlec. The defendant acknowledged that he knew Kadlec had been dealing in drugs, and while he denied knowledge of what was in the sack that was left with him, he was present when Kadlec removed most of the amphetamines from the sack and made no effort to explain his failure to observe the transfer.

■■ In order to bring an accused within the provisions of the statute three propositions must be established: (1) that he solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) that the participation on his part must have taken place either before or during the commission of the offense; and (3) that it must be with the concurrent specific intent to promote or facilitate the commission of the offense. *People v. Ramirez*, 93 Ill.App. 2d 404, 236 N.E.2d 284.

■■ The statute makes it clear that the legislature did not intend to

664

establish criminal responsibility simply through guilt by association, a thoroughly discredited doctrine. (*People v. Ramirez*, 93 Ill.App.2d 404, 236 N.E.2d 284; *Uphaus v. Wyman*, 360 U.S. 72, 79, 3 L.Ed.2d 1090, 79 S.Ct. 1040.) Mere presence at the commission of the crime is not culpable. (*People v. Barnes*, 311 Ill. 559, 143 N.E. 445; *People v. Cione*, 293 Ill. 321, 127 N.E. 646; *Crosby v. People*, 189 Ill. 298, 59 N.E. 546; *People v. Bracken*, 68 Ill.App.2d 466, 216 N.E.2d 176.) Even consent, though involving moral turpitude, does not constitute aiding and abetting. *Jones v. People*, 166 Ill. 264, 46 N.E. 723.

■■■■ In *People v. Barnes*, 311 Ill. 559, 562, 143 N.E. 445, the supreme court said:

> "Aiding, abetting or assisting are affirmative in their character. It is not sufficient that there is a mere negative acquiescence not in any way made known to the principal malefactor. The mere presence of a person is not sufficient to constitute him a principal unless there is something in his conduct showing a design to encourage, incite or in some manner aid, abet or assist the actual perpetrator of the crime."

■■ It is not necessary for the defendant to be present when the sale takes place (*People v. Calcaterra*, 33 Ill.2d 541, 213 N.E.2d 270 (1966)), nor is it required that he be in possession of the marked money (*People v. Aldridge*, 19 Ill.2d 176, 179-80, 166 N.E.2d 563 (1960)). In *Aldridge* the court said:

> "The fact that Coleman [the co-defendant] still had the marked money when they were arrested does not disassociate Aldridge from the transaction."

We believe there is ample evidence to sustain the conviction of the defendant as to Count II.

■■ Defendant's final contention relates to the constitutionality of section 401(a) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1971, ch. 56½, par. 1401(a)), under which he was convicted. He maintains the statute is violative of the due process and equal protection provisions of the State and Federal constitutions by providing penalties to be determined by the weight of the substance containing amphetamines. This issue was raised in prior cases before this court (*People v. Campbell*, 16 Ill.App.3d 851, 307 N.E.2d 395 (3rd Dist. App. Ct. 1974); *People v. Kline*, 16 Ill.App.3d 1017, 307 N.E.2d 398 (3rd Dist. App. Ct. 1974)) where such issues were discussed at length. While both cases dealt with section 4(c) of the Cannabis Control Act (Ill. Rev. Stat. 1971, ch. 56½, par. 704(c)) and related to the possession of cannabis, we believe the principle stated in *People v. Kline, supra*, is equally applicable to the case at bar. *People v. Peterson*, 16 Ill.App.3d 1025, 307 N.E.2d 405.

For the foregoing reasons the judgment of the Circuit Court of Will County is affirmed.

Judgment affirmed.

ALLOY and DIXON, JJ., concur.