(No. 37496.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PAUL L. GIPSON, Plaintiff in Error.

*Opinion filed November 26, 1963.*

ARNOLD S. ROOT, of Chicago, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and ELMER C. KISSANE and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant Paul Gipson, together with Major Bridges, was named in two indictments returned on March 15, 1960, by the Cook County grand jury, the first of which, No. 60-883, charged he obtained $10 from Lola Wilson on October 10, 1959, and the second, No. 60-884, alleged he secured $450 from Gwendolyn Nichols on January 7, 1960, in each case by means of the confidence game.

The State's motion to *nolle pros* indictment No. 60-883 as to Major Bridges only was allowed. At a separate bench trial held before the judge who later tried the instant case, Major Bridges was acquitted in case No. 60-884. Thereafter both indictments were consolidated and defendant found guilty on each charge following a bench trial. He was given concurrent sentences of two to ten years imprisonment.

Defendant here contends that the People failed to prove

his guilt beyond a reasonable doubt and failed to prove the *corpus delicti* of the offense of obtaining money by means of the confidence game. The State maintains that the acquittal of Bridges at a separate trial on the same indictment for obtaining money by means of the confidence game did not require the acquittal of the defendant on indictment No. 60-884. The defendant offered no testimony.

The testimony of Lola Wilson on indictment No. 60-883, in substance, is that at 11:00 P.M. defendant stopped her on the street near her home and asked directions to the post office or police station. Upon being told the directions, he stated to her that a "guy" had just found some money. Thereafter an unknown man approached them. Upon being asked by the defendant, "You're the guy that found the money, aren't you?", the unknown man responded, "You mean you told her about the money? That means that we will have to split the money three ways." The unknown man then showed her a wallet he said he had found, but did not show her the contents. He then said, "Since you have seen it, you will have to get something, have to take something. We will have to split it." The unknown man then represented that he would go to a currency exchange for change, but soon returned saying the currency exchange would want to know why he had so much money and the money could be marked. While he was gone defendant conversed with the complaining witness about his friend from Detroit.

The defendant then represented that he had money in his locker where he worked and upon returning in 10 minutes stated that his boss had heard him, was afraid he had stolen the money and had kept it. During his absence the unknown man and complaining witness walked around the corner to her home. After his return the defendant came to the complaining witness's home and said that if the defendant and the complaining witness were to get their share of the money from his boss, that they would have to show a certain amount of money to prove that they were reliable

people and that they wouldn't go around telling everybody where they did get the money. The complaining witness told them that she didn't have but $25. Defendant then said, "That's not enough," and "I have about $700.00 here that I have got to show," exhibiting an envelope with something green in it. Defendant then asked her, "Do you have any money in the bank?" When it was stated that the bank was closed, defendant said, "Well, give me what you have got." After the complaining witness said her husband would want to know what she had done with the money when he came home, defendant suggested, "Well, give me $10.00 and your telephone number and I'll call you Monday morning." The complaining witness gave $10 to the defendant who handed it to the unknown man and they left.

Thereafter complaint and her husband notified police. On Monday the defendant called the complaining witness, and accompanied her to a bank, where he was arrested before any more money was paid to him.

The testimony of Gwendolyn Nichols on indictment No. 60-884, was that Major Bridges approached her at a bus stop in the loop and told her his friend had found $600, and asked for directions to the Tribune Building. The defendant then approached her and said that since Major Bridges told her about the money he would have to take her to see his boss. She accompanied them to an office-building room where a man named Johnson was represented to be the defendant's boss. Johnson, in the presence of the complaining witness, then asked the defendant about the money, and defendant replied that he had the money; the complaining witness supposed this to be the money defendant claimed to have found but which she had never seen. Defendant then told complaint that Johnson was going to let the defendant drive her to her home in Morgan Park to get the money which she had told the defendant that she had at home, because Johnson would have to see some money before he would give complainant her share of the $600. Defendant

and Bridges, with the complaining witness riding between them in the front seat and the defendant driving, went to her home where she obtained $145 to $150 cash and from there to a Blue Island bank where she withdrew $300 in cash. Defendant then drove to 95th and Halsted, where the complaining witness gave $450 to the defendant. Defendant thereupon handed the money to Bridges, left the car, went into a doughnut shop, returned, stated that the boss wanted to see her and told complainant to go to the doughnut shop and order a cup of coffee, and that Johnson was going to come in and call her name, and if she answered, Johnson would give her the $450 which she had given the defendant and her share of the $600 which the defendant claimed he had found. She did so, and after 5 minutes came out of the doughnut shop and found the car and men gone.

The applicable statute, section 98 of division 1 of the Criminal Code (Ill. Rev. Stat. 1959, chap. 38, par. 256) provides, "Every person who shall obtain or attempt to obtain from any other person or persons any money, property or credit by means or by use of any false or bogus check or by any other means, instrument or device commonly called the confidence game shall be imprisoned in the penitentiary not less than one year nor more than ten years." In discussing its purpose we have said (*People* v. *Jackson,* 4 Ill.2d 296) the legislative intent was to reach the class of offenders known as "confidence men" who practice swindling schemes, "as various as the mind of man is suggestive," upon unwary victims. We also stated that "any fraudulent scheme, trick or device whereby a swindler wins the confidence of his victim and then cheats him out of his money or property by taking advantage of the confidence reposed in him is a confidence game." The gist of the crime of obtaining money by means of the confidence game is the trust or confidence reposed in the swindler, obtained by some fraudulent scheme, trick or device, which confidence is afterwards be-

trayed and money or property obtained from the victim, the form of the transaction being immaterial. *People* v. *Mero*, 4 Ill.2d 327, and cases cited therein.

Proof of the *corpus delicti*, allegedly lacking here, is ordinarily accomplished by establishing that the specific crime charged has actually been committed by someone. (14 Am. Jur., Crim. Law, sec. 6.) Compliance with this rule was sufficiently demonstrated by proof that the complainants in these two cases gave defendant money because of their confidence in his patently fraudulent statements that they would receive much larger sums in return. The contention that proof of the *corpus delicti* was lacking is wholly untenable.

Defendant's argument that the evidence failed to prove his guilt beyond a reasonable doubt centers upon what he regards as the generally unreasonable and unsatisfactory character of the complainant's testimony. He also points out that Mrs. Wilson's husband was not called to corroborate her, and that his absence is unexplained. We have repeatedly held that the fact that only a single witness testified to the commission of a crime is insufficient to justify a reversal, (*People* v. *Johnson*, 411 Ill. 276), and that the uncorroborated identification of a defendant by a credible witness is sufficient to convict although contradicted by the accused. (*People* v. *Neukom*, 16 Ill.2d 340; *People* v. *Burts*, 13 Ill.2d 36.) The absence of the husband of Lola Wilson is adequately accounted for, if any accounting be thought necessary, by the fact that there is nothing in this record to indicate his conversations with his wife would have been anything other than inadmissible hearsay as to defendant. The essence of defendant's argument is that complainant's testimony is such as to indicate a degree of gullibility so extreme as to be unbelievable. While we may agree that a normally intelligent person with a reasonable amount of business experience would hardly have confidence in a stranger

under the circumstances here related, it is precisely the person lacking in such qualities whom the statute is designed to protect.

While Lola Wilson stated on cross-examination that she did not trust defendant as she walked to the bank with him, she also stated that she did have confidence in him at the time she gave him the $10 on the preceding Saturday prior to talking to her husband and calling the police, and it was this transfer of money upon which the indictment was based. Nor is it material whether defendant kept the money or gave it to Bridges, since defendant would be guilty even though he had a confederate to whom he gave the money. *People* v. *Krazik,* 397 Ill. 202.

The credibility of the witnesses was a question for the trial court. The testimony is ample, if believed, to support the findings, and we may not substitute our judgment for that of the judge who saw the witnesses and heard their testimony. *People* v. *Mero,* 4 Ill.2d 327; *People* v. *Collins,* 25 Ill.2d 605.

An additional claim is made regarding the trial under indictment No. 60-884 that the acquittal of Bridges on this charge is conclusive as to Gipson, by reason of the doctrines of estoppel by verdict and *res adjudicata.* It is clear, however, that this position cannot be maintained. The only proof that Bridges was found not guilty lies in a copy of a judgment order so declaring which is appended to defendant's brief. This is not properly before us, and may not be considered. *People* v. *Neukom,* 16 Ill.2d 340.

The judgments of the criminal court of Cook County are affirmed.

*Judgments affirmed.*