THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CLIFFORD BOLDEN *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 62727, 62755, 63075,
63077, 63208, 76-767 cons.

Opinion filed April 14, 1978.—Modified on denial of rehearing May 12, 1978.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill and John Thomas Moran, Assistant Public Defenders, of counsel), for appellants Stanley Johnson, William Mosley, Herman Houston, and Clifford Bolden.

Edward J. Whalen, of Chicago (Gann, McIntosh, Flaherty & Parker, of counsel), for appellant William Cunningham.

T. Lee Boyd, Jr., and Isaiah S. Gant, both of Chicago, for appellant Johnny Armstrong.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from a judgment entered on the verdicts of a jury finding all defendants guilty of involuntary manslaughter. Each was sentenced to three to 10 years imprisonment. Their appeals have been consolidated for review, and they jointly present the following issues: (1) whether a conviction for involuntary manslaughter is legally sufficient when grounded on an accountability theory; and (2) whether they were denied a fair trial by certain prosecutorial remarks in closing argument. Four defendants—Armstrong, Bolden, Cunningham and Mosley—also contend that they were not proved guilty beyond a reasonable doubt. In addition, three defendants individually contend that each was denied a fair trial through the following means: (1) Bolden's pretrial silence was used against him; (2) evidence of an unrelated crime was improperly adduced against Johnson; and (3) Cunningham was denied the right of confrontation. Lastly, four defendants—Bolden, Houston, Johnson and Mosley—argue that giving a motive instruction in the case at bar was cumulative error.

It appears that at approximately 1 a.m. on August 20, 1974, a group of young men fired 15 to 20 shots in the first floor breezeway of an apartment building, and two of these rounds fatally wounded Mary Alice King who had been standing near the eastern edge of the breezeway. Shortly before any gunfire was heard, Mary Alice's brother (Pierre) and several friends, including Willie Jackson, were playing in a grassy area adjoining the building to the east. Also, Cornell Newsom was sitting in front of a first floor apartment 20 to 40 feet from the eastern edge of the breezeway, and Dale Cathery (Mary Alice's first cousin) was in a stairwell which opened onto the breezeway.

At trial, Pierre testified that he and a friend were wrestling when his attention focused upon the eastern edge of the breezeway, where he saw his sister standing, and he then observed Armstrong[1] as he turned the corner of the breezeway carrying a shotgun. Almost immediately thereafter, he heard a gun discharge. Although his vision was momentarily distracted, he said that several more shots were fired and that he heard Mary Alice shout, "Weasel," which he knew to be Armstrong's nickname, and an unidentified voice saying, "Damn Bun, you shot a girl." After a total of 15 to 20 shots were fired, Pierre observed Armstrong (still carrying the shotgun) leave the breezeway followed by

---

[1] Defendant Johnny Armstrong. His brother is referred to in this opinion as Jimmy Armstrong.

Bolden, Houston and Johnson, who were carrying handguns. Thereafter, Pierre ran to the north side of the building, where he saw Bolden and Cunningham enter an automobile which was driven away.

Newsom testified that he saw Mary Alice standing near the breezeway when shots were fired and, upon hearing gunfire, he and his friends ran up to the second floor. While running, he looked over his shoulder and observed Armstrong enter the breezeway with a shotgun. Once upstairs, he heard the sound of approximately 20 rounds being fired below. While intermittent gunfire was taking place, he crept downstairs and saw Houston (whom he knew as "Honey Boy" or "Bun"), Bolden, Johnson and Armstrong holding guns as they stood around Mary Alice. He further observed Johnson firing his gun in the air as he warned tenants in nearby apartments not to peer out of their windows. He also heard Armstrong, who he knew as "Weasel," shout "Bun, you shot a girl," and Houston (whose nickname was Bun) reply, "I didn't shot a girl, you shot a girl."

Cathery testified that she was about to enter the breezeway from a stairwell when she heard the sound of gunfire. She remained in the stairwell for two or three minutes after the gunfire had subsided and at this time observed a group of young men—one of whom shouted, "Weasel"—running through the breezeway. She also saw Mosley running through the breezeway, but he was separate and apart from the group, and she noted that he carried something in his hand which looked like a gun. She could not, however, be sure that it was a gun.

Thereafter, Pierre, Newsom and Cathery converged at the eastern edge of the breezeway, finding Mary Alice lying in a pool of blood. A representative of the coroner's office testified that she died of two gunshot wounds, but he recovered only one .38-caliber bullet from the body and no shotgun pellets.

Officer Eichler testified that when he arrested Houston on August 22, the latter's mother accompanied them to the police station. In Eichler's presence she told her son, "You go with the officers and you tell them the truth. I just want you to tell the truth." She was asked whether she would like to stay, but she declined. Houston was then read the *Miranda* warnings, at which point he declared his intent to tell the truth and stated that he had been at the scene of the incident in question; that he carried and fired a shotgun; that he called out his own nickname, "Honey Boy"; and that he fled without knowing that a girl had been shot.

The first witnesses for the defense were Cunningham's parents and sister, who testified that he was hospitalized from July 12 to August 10, 1974, as a result of a gunshot wound. This testimony was substantiated by the stipulated testimony of two physicians from Provident Hospital. Each member of his family further testified that when Cunningham left the hospital, he remained in their apartment—including the time of the

occurrence in question—and that he was not able to leave without assistance.

Bolden, a witness in his own behalf, his wife and Lawrence Ames testified that they and Ames's wife were playing cards and watching television in the Bolden apartment from 10 p.m. August 19 to 1:30 to 2 a.m. of the next morning, and that Bolden never left the apartment during this period. On cross-examination, however, defendant admitted that he told the police only that he was at home at the time of the incident, without mentioning that others were with him.

Armstrong, testifying on his own behalf, stated that he watched television in his bedroom from 9 p.m. on August 19 until the last show ended. He then retired and remained in bed until 11 a.m. of the following day. He further testified that he was not a gang member, but that Pierre was a member of the Blackstone Rangers gang led by Willie Jackson, an occurrence witness who was not called to testify.

The jury was instructed as to the elements of murder and accountability upon the request of the State and as to the elements of involuntary manslaughter upon the request of the defense.

OPINION

■■ Defendants initially contend that an involuntary manslaughter conviction is legally insufficient if grounded on an accountability theory. We disagree.

"A person who kills[2] an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1973, ch. 38, par. 9—3(a).)

To be accountable for the acts of another, one must have a specific intent to promote or facilitate the commission of a crime. (*People v. Ramirez* (1968), 93 Ill. App. 2d 404, 236 N.E.2d 284.) As stated in *People v. Hill* (1977), 53 Ill. App. 3d 280, 284, 368 N.E.2d 714, 717, the State is deemed to have proved such intent "where it establishes 'beyond a reasonable doubt

---

[2] Effective October 1, 1975, this provision was amended to read "unintentionally kills" (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a)) and, in their briefs and during oral argument before this court, defendants contended that accountability was an erroneous theory, as one cannot specifically intend to bring about an unintended result; *i.e.*, death. While this theory appears meritorious at first blush, it cannot withstand close scrutiny. Prior to the 1975 amendment, whether or not the accused intended to kill the victim was viewed as immaterial. (See *People v. Towers* (1974), 17 Ill. App. 3d 467, 308 N.E.2d 223; *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.) Therefore, the amendment operates only to preclude convictions of involuntary manslaughter where the evidence establishes that the accused's conduct was actually performed with the intent that death ensue. As defendants do not claim that the evidence established an intentional killing of Mary Alice, the insertion of the term "unintentionally" can have no applicability to the case at bar. In any event, the effectiveness of the amendment post-dated the occurrence in this case.

that defendant shared the criminal intent of the principal, or that there was a community of unlawful purpose.' [Citation.] A community of purpose or common design may come as a result of either prior deliberation that the purpose or design be fulfilled by the commission of a specific offense [citation] or the spontaneous and combined participation of a group in the perpetration of an offense [citation]." To be guilty of involuntary manslaughter one need not intend that death ensue from his reckless acts, as the only mental state required is a conscious disregard of a substantial and unjustifiable risk that death or great bodily harm will be the result of such acts. ((*People v. Parr* (1976), 35 Ill. App. 3d 539, 341 N.E.2d 439; *People v. Carlton* (1975), 26 Ill. App. 3d 995, 326 N.E.2d 100; *People v. Towers* (1974), 17 Ill. App. 3d 467, 308 N.E.2d 223; *People v. Bolden* (1968), 103 Ill. App. 2d 377, 243 N.E.2d 687.) The repeated discharge of a gun in a confined area is such a gross deviation from the standard of care which a reasonable person would exercise that it constitutes recklessness. See *People v. Bauman* (1975), 34 Ill. App. 3d 582, 340 N.E.2d 178; *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.

■■ In light of the foregoing authority, we believe that more than one person can share a conscious disregard of a substantial and unjustifiable risk that death or great bodily harm will result from their participation in aiding and abetting each other's reckless conduct. In such circumstances, participants would have formed the specific intent to promote or facilitate the commission of the crime of involuntary manslaughter. Therefore, we cannot say that a conviction of involuntary manslaughter is legally insufficient if grounded on an accountability theory.

■■ Next, Armstrong, Bolden, Cunningham and Mosley contend that they were not proved guilty of manslaughter beyond a reasonable doubt. · Concerning Cunningham and Mosley, we agree; however, we find the contentions of Armstrong and Bolden to be without merit.

■■ ■ The jury which saw and heard the witnesses is in a superior position to ascertain which of them was worthy of belief, and its determination will not be set aside unless the evidence is so unsatisfactory as to leave a reasonable doubt of guilt. (*People v. Houck* (1977), 50 Ill. App. 3d 274, 365 N.E.2d 576.) A witness's prior acquaintanceship with the accused may be considered in assessing the weight and credibility of his identification testimony. (*People v. Grey* (1973), 14 Ill. App. 3d 310, 302 N.E.2d 473.) In addition, the trier of fact is not obliged to believe alibi testimony over that positively identifying the accused as an offender even where the alibi testimony is given by a greater number of witnesses. (*People v. Setzke* (1961), 22 Ill. 2d 582, 177 N.E.2d 168.) Moreover, the positive identification of the accused as the perpetrator of the offense by a single witness will support a conviction (*People v. Catlett* (1971), 48 Ill. 2d

56, 268 N.E.2d 378), and the State need not introduce evidence corroborative of this identification (*People v. Gipson* (1963), 29 Ill. 2d 336, 194 N.E.2d 318) either by producing cumulative physical evidence (*People v. Mimms* (1976), 40 Ill. App. 3d 942, 353 N.E.2d 186) or by calling all occurrence witnesses to testify (*People v. Nowak* (1970), 45 Ill. 2d 158, 258 N.E.2d 313). The State may, however, be subjected to a negative inference should it fail to call a witness who was in a better position to observe than the one who testified. *People v. Hickman* (1973), 9 Ill. App. 3d 601, 291 N.E.2d 872; *People v. Williamson* (1966), 78 Ill. App. 2d 90, 223 N.E.2d 453.

■■ Regarding accountability, it is not established by mere presence at the scene and flight therefrom in the absence of some other circumstances. (*In re Whittenburg* (1976), 37 Ill. App. 3d 793, 347 N.E.2d 103; *In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606.) However, words of agreement need not be adduced at trial, as the jury may infer an agreement from the conduct of the accused in attaching himself to a group which combines to act in circumstances showing a common design to do an unlawful act to which all assent. (*People v. Tate* (1976), 63 Ill. 2d 105, 345 N.E.2d 480.) Where the activity of a group results in the death of another, it has been said:

> "Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes criminally liable for any wrongdoings committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively participate in the overt act itself. [Citations.]" *People v. Hughes* (1962), 26 Ill. 2d 114, 119-20, 185 N.E.2d 834, 837.

Here, Newsom observed Armstrong, Bolden, Houston and Johnson carrying firearms as they were near Mary Alice and, as intermittent gunfire emanated from the breezeway where they stood, Pierre heard her shouting Armstrong's nickname. Moments after a total of 15 to 20 rounds were fired, Pierre saw Armstrong, Bolden, Houston and Johnson (each carrying a weapon) leaving the location where he found Mary Alice wounded and lying in a pool of blood. Moreover, during the course of the shooting spree, Armstrong and Houston were heard by Newsom blaming each other for firing the shots which wounded Mary Alice. Newsom also observed Johnson fire his weapon while warning nearby apartment dwellers not to peer out from their windows, and Houston—through his pretrial oral statement—admitted firing his weapon in the breezeway. Moments after the shooting subsided, Pierre saw Cunningham enter a car with Bolden and drive away, and Cathery saw Mosley running—but apart

from the group which was running in the same direction. Pierre further testified that although he had a previous acquaintanceship with Mosley and observed all those involved in the shooting spree, he could not say that Mosley had been among this group.

Although Armstrong and Bolden presented alibi evidence, the jury could have believed Pierre's testimony that they were at the scene of the occurrence—particularly in light of their prior acquaintanceship, whereby he knew the nicknames used by Armstrong and Bolden. (*Grey.*) Furthermore, while no evidence was adduced as to who actually wounded Mary Alice or that Bolden fired the weapon which he carried, we believe there was sufficient evidence from which the jury could believe that as members of the group, Armstrong and Bolden lent aid and assistance to the group's activity by carrying weapons; that Armstrong and Bolden knew nearby apartments were habitated; that Mary Alice was standing in close proximity; and that therefore Armstrong and Bolden, as members of this group, shared a conscious disregard of the substantial and unjustified risk that death to a bystander would result from their shooting spree. Accordingly, we cannot say that the evidence of Armstrong's and Bolden's participation in furtherance of a common design was so unsatisfactory as to leave a reasonable doubt of their guilt.

■■■ We would note further that we do not believe that the State's failure to call Jackson raised a negative inference, as the record does not show that he was in a better position than Pierre or Newsom to observe the occurrence. (*Hickman; Williamson.*) Moreover, we find no merit in the argument that the testimony of Pierre and Newsom was discredited or should be discounted because they adopted Jackson's police station report of the occurrence as their own. Pierre and Newsom both testified that the police took their statements separately and then typed up a single statement as a composite of all the reports of the occurrence witnesses, which was then signed by each such witness. The testimony given by Pierre and Newsom was positive and based upon their observations of the occurrence and, as they stated that by signing the composite report they intended only to affirm those portions which they actually observed, we cannot say that this procedure substantially diminished their credibility.

■■ Concerning Cunningham and Mosley, our review of the record reveals that no circumstances were adduced at trial other than their presence at the scene of the occurrence and their flight therefrom. Moreover, no witness could positively testify that either carried a weapon or participated in the shooting spree. Such evidence, in our opinion, leaves doubt as to their guilt. (See *Whittenburg; Woods.*) For this and other reasons, which will appear as this opinion unfolds, their convictions of involuntary manslaughter must be reversed.

All remaining defendants next contend that by referring to them as a "gang" during closing argument, the prosecutor deprived them of a fair trial. Additionally, Bolden, Houston, Johnson and Mosley contend that other prosecutorial comments deprived them of a fair trial by calling the jury's attention to the fact that the remaining defendants had not been directed out and by commending the State's witnesses for their display of courage in testifying. Cunningham further argues that he was denied a fair trial by the prosecutor's misstatement of the evidence adduced against him. Concerning Cunningham and Mosley, we agree; but we disagree with the contentions of Armstrong, Bolden, Houston and Johnson.

The scope of prosecutorial argument has been defined in the following terms:

> " 'Statements of counsel and argument based upon facts and circumstances proved, or upon legitimate inference therefrom, do not exceed the bounds of proper debate and are not to be discountenanced by the courts. [Citation.] It is not improper for the prosecuting attorney to reflect unfavorably on the defendant, or to comment on his actions, if based upon competent and pertinent evidence. [Citations.] Similarly, the State's Attorney has a right to dwell on the evil results of crime and to urge fearless administration of the law. [Citation.]' " (*People v. Burnett* (1963), 27 Ill. 2d 510, 517, 190 N.E.2d 338, 342.)

Moreover, where it does not appear that the remarks complained of influenced the jury in a manner that resulted in substantial prejudice to the accused, reversal is unwarranted. *People v. Stahl* (1962), 26 Ill. 2d 403, 186 N.E.2d 349; *People v. Bell* (1975), 27 Ill. App. 3d 171, 326 N.E.2d 507.

Here, the prosecutor twice remarked without objection that defendants acted as if they were a gang and then referred to them as a street gang. An objection by all defendants to this last remark was sustained. Defendants' position is that the use of this term provided the jury with a means to find that they acted in furtherance of a common scheme where the evidence showed that none existed.

As noted above, the evidence of their participation in the occurrence supports an inference that Armstrong, Bolden, Houston and Johnson acted like a gang on a shooting spree, regardless of whether they were or had ever been enrolled as members of a particular street gang. Upon our review of the record, we believe that this was the tenor of the prosecutor's remarks. However, even if the jury understood the comment as indicating knowledge of the prosecutor that defendants were actually members of a particular street gang, such an inference would add nothing to the case against Armstrong, Bolden, Houston and Johnson since accountability turns upon the codefendants' activities leading up to and during the

incident in question, rather than evidence that they were (*Hughes; People v. Rudecki* (1923), 309 Ill. 125, 140 N.E. 832) or were not (*Tate*) members of an organized street gang.

■■ However, concerning Cunningham and Mosley, such an inference could in the minds of some jurors supply a circumstance in addition to their presence at the scene and flight therefrom. Thus, although the trial court on three occasions cautioned the jury to disregard arguments not based upon the evidence, we cannot say that these remarks did not contribute to their conviction. Accordingly, we believe that Cunningham and Mosley, but not Armstrong, Bolden, Houston or Johnson, were denied a fair trial by the prosecutorial use of the term "street gang."

■■■ Next we consider the prosecutor's remark concerning Jimmy Armstrong, who had been indicted and tried with defendants and in whose favor the trial court directed the verdict because no State's witness had been able to place him at the scene of the incident in question. During closing argument by Johnson's counsel, he commented that while at the police station, Pierre indicated that he could identify Jimmy Armstrong as a perpetrator but that at trial he could not so identify him. Counsel argued further that Pierre was so influenced by the police and Willie Jackson that any identification made by him of others was questionable. In response, the prosecutor argued that Pierre's own testimony established his independence and credibility by stating:

> "You recall Pierre King telling you he never, never saw Jimmy Armstrong before that evening. The other defendants he was familiar with, had seen them around the projects, but he never saw Jimmy Armstrong before that evening. He sat on the stand and said that night when I saw his photograph in the book I signed my name by his picture or by the statement giving his name because I believed I saw him out there.
>
> Then he told you under cross examination, not by a prodding by the People under cross examination, he told you folks that I can't be sure today ten months later, I never saw Jimmy Armstrong before that night, before that incident, and I am under oath and I am on that stand ten months later I cannot tell you people that I am positive as I look at him today that that was the individual I saw up there that night.
>
> Well, this is the liar, this is little conspirator telling you folks that and then properly so the Judge telling you that there was a reasonable doubt to Mr. Jimmy Armstrong and directed his case out.
>
> But Mr. Pierre King was not equivocal to the identifications he gave to the rest of the defendants. The people he had seen before and you folks are still here judging whether or not they are guilty or innocent, they were not directed out."

It is not error *per se* to comment upon the fact that a defendant had been directed out of the case where, as here, the trial court without objection had apprised the jury of this fact. (See *People v. Lomax* (1970), 126 Ill. App. 2d 156, 262 N.E.2d 63.) Moreover, while a prosecutor may not attempt to shift the burden of proof unto the accused by stating that he had dismissed the charges against another and would have dismissed the case against the accused had he thought him innocent (*People v. Hopkins* (1970), 124 Ill. App. 2d 415, 259 N.E.2d 577; *People v. Fuerback* (1966), 66 Ill. App. 2d 452, 214 N.E.2d 330), we believe this was not done here as the comment was only incidental to a discussion of Pierre's credibility and, in our opinion, went no further than the language of the court's instruction, which defendants have not challenged.

■■ We next turn to the contention of Bolden, Houston, Johnson and Mosley that the prosecutor's commendation of the State's witnesses' display of courage in testifying denied them a fair trial. The trial court sustained defendants' objection to this comment, as it was unwarranted by the evidence. We agree with this view and, as we believe any prejudice was cured by the trial court's comment, we cannot say that defendants were denied a fair trial by the utterance. *Stahl; Bell.*

■■ Next, we reach Cunningham's contention that he was denied a fair trial by the prosecutor's misstatement of the evidence, wherein he indicated that Pierre testified that Cunningham carried and fired a weapon and by the trial court's failure to sustain his objection to this comment. Pierre did not so testify, nor did any other witness, and although the jury was instructed to disregard argument not based on evidence, we believe the trial court's confusion as to what the evidence had shown forecloses a finding that the misstatement was harmless.

For the reasons stated, we believe that Cunningham and Mosley (but not Armstrong, Bolden, Houston or Johnson) were denied a fair trial by prosecutorial misconduct.

■■ ■ Bolden next contends that he was denied a fair trial by the State's use of his pretrial silence. We cannot agree. Silence at the time of arrest may not be used for impeachment purposes. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) Whether the accused has been apprised of the *Miranda* warnings (*Doyle*) or has reason to know of the rights contained within the warnings (*People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138), "his failure to offer an explanation during the custodial interrogation can as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication." (*United States v. Hale* (1975), 422 U.S. 171, 177, 45 L. Ed. 2d 99, 105, 95 S. Ct. 2133, 2137.) An accused who testifies at trial that he had offered the same explanatory matter to the police may be cross-examined or subjected to rebuttal testimony indicating that he had not done so (*People v. Szabo* (1977), 55 Ill. App. 3d

866, 371 N.E.2d 117; *People v. Johnson* (1976), 42 Ill. App. 3d 194, 355 N.E.2d 577), while one who gives the police only a partial explanation regarding the incident and who testifies at trial to a more complete version without stating that he gave the latter version to the police, cannot be cross-examined in a manner which would reveal his omissions of detail in the earlier statement. (*People v. White* (1977), 53 Ill. App. 3d 326, 368 N.E.2d 660; *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43.) In other words, an accused may not with impunity tell a jury that he had at all times offered the explanatory matter when he in fact had not done so, but his right to silence, whether in regard to the entire incident or details thereof, is constitutionally protected. Moreover, the prosecutor may not comment upon the fact that the accused has exercised his constitutional right against self-incrimination. *Doyle; Hale; Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

■■ Here, Bolden learning that the police were looking for him, went to the station and asserted that he was at home at the time of the incident in question. During cross-examination, and without objection, he testified that he had not told police that others could verify his alibi. Thereafter, in closing argument, the prosecutor questioned whether his alibi was a true account when he had not told the police of such potential witnesses. We believe the prosecutor's conduct violated the *Robinson* rule, but we cannot say that such error requires the reversal of Bolden's conviction.

■■ While we note the existence of recent authority, which has held that a violation of *Doyle* can never be viewed as harmless in character (*People v. Green* (1977), 53 Ill. App. 3d 820, 368 N.E.2d 1129; *People v. Williams* (1977), 45 Ill. App. 3d 769, 360 N.E.2d 151; *United States v. Harp* (5th Cir. 1976), 536 F. 2d 601), we agree with and deem controlling the reasoning in *People v. Buckley* (1976), 41 Ill. App. 3d 989, 994, 355 N.E.2d 207, 210-11, wherein it was stated:

> "In *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, the Supreme Court established the standard which should be applied when deciding whether comment on defendant's exercise of his Fifth Amendment privilege amounts to reversible error. The Court held that in order for an error involving the denial of a Federal constitutional right to be held harmless in a State criminal case, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to defendant's conviction. Consideration must be given to the prejudicial effect the introduction of such testimony would have on defendant's trial. Where the evidence of guilt is otherwise 'overwhelming,' the error will be held to be harmless beyond a reasonable doubt. *United States v. Wick*, 416 F. 2d 61 (7th Cir. 1969); *People v. Gilyard*, 124 Ill. App. 2d 95, 260 N.E.2d 364, and *People v. Anthony*, 38 Ill. App. 3d 190, 347 N.E.2d 179."

Bolden was positively identified by two occurrence witnesses as a gun carrying member of the group which fired numerous shots in close proximity to Mary Alice, and the identification of Bolden by Pierre was not only a result of the observation of the occurrence but also of their prior acquaintanceship whereby he knew Bolden's nickname. Under such circumstances, proof of his guilt was, in our opinion, overwhelming (*Buckley*) and, in view thereof, we do not believe the error denied Bolden a fair trial.

Johnson contends also that the admission of evidence of an unrelated crime and the prosecutor's comment upon such evidence during closing argument denied him a fair trial. We cannot agree. Generally, evidence of unrelated crime is inadmissible, but an exception is recognized where such evidence tends to aid in the identification of the accused as the perpetrator of the offense charged. *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529.

■■ ■ Here, when asked if he had ever seen Johnson before the incident in question, Newsom replied that five years before Johnson had pulled a gun on him. Since Newsom did not further testify as to whether or not Johnson was justified in doing so, he did not expressly give evidence of an unrelated crime but, assuming that the jury so understood the response, it was nonetheless admissible as it related to Newsom's ability to identify Johnson. (*Grey.*) Moreover, the prosecutor's comment in closing argument related the incident to Newsom's ability to identify Johnson rather than to the latter's propensity to commit crime. Accordingly, we find no error either in the admission of the testimony or in the prosecutor's comment.

Cunningham maintains also that he was denied the right of confrontation. We agree. The admission of hearsay, which serves as a substitute for an in-court identification constitutes reversible error, as the accused is deprived of the opportunity to cross-examine the declarant. *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.

■■ Here, over defense objection, the officer who arrested Cunningham testified that shortly after the arrest, Willie Jackson (an uncalled occurrence witness) pointed to Cunningham. In response to defendant's objection, the State assured the trial court that it would later call Jackson, but this was not done. The State, citing *People v. Sanders* (1976), 37 Ill. App. 3d 236, 345 N.E.2d 757, argues that it was unnecessary to call him, as the officer's testimony was confined to his observations of physical activities. In *Sanders*, an officer testified only that a conversation had taken place, without disclosing its substance, and it was the failure to disclose the out-of-court declarant's assertion which was determinative of admissibility, rather than the witness's observation of a physical activity; *i.e.*, the conversation. In the case at bar, however, the officer in describing a physical activity included the necessary assertion that an occurrence

witness had identified Cunningham as a perpetrator. Therefore, hearsay served as a substitute for the declarant's courtroom identification, and Cunningham was effectively denied the right to confront his accusor. *Coleman.*

Lastly, Bolden, Houston, Johnson and Mosley contend that the trial court erred in giving a motive instruction. We cannot agree.

■■ An instruction stating that the prosecution need not prove a motive for the commission of the crime charged is proper except where the State adduces evidence of a motive and the prosecutor argues the circumstance of motive to the jury. (Illinois Pattern Jury Instructions, Criminal No. 3.04 Committee Note (1968).)

> "[However], a reversal is not indicated because of some error during the trial unless it reasonably appears that the jurors, or at least some of them, have been influenced or prejudiced to the extent they cannot be fair and impartial. [Citation.]" *People v. Manzella* (1973), 56 Ill. 2d 187, 200, 306 N.E.2d 16, 22, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644.

Here, during the course of his opening statement, the prosecutor stated that he believed the evidence will show that as the group ran through the breezeway discharging weapons, they shouted, "The Stones run it." The State did not thereafter adduce evidence which showed that any defendant was a member of "The Stones" or that such a statement was uttered. The defense did, however, elicit evidence that Pierre and Jackson were members of the Blackstone Rangers and implied through propounded questions that the State's witnesses testified against defendants due to some animosity between the inhabitants of the building where they previously or presently resided and the inhabitants of other nearby buildings in which some (if not all) of the defendants presently or formerly resided. During closing argument, the prosecutor emphasized the inference that defendants acted in violent consert as a gang, but no attempt was made to argue motive—such as taking revenge, instilling terror, facilitating some form of extortion, etc. Therefore, we cannot say that giving the motive instruction in the instant case constituted error.

For the reasons stated, convictions and sentences of defendants William Cunningham and William Mosley are reversed; and the convictions and sentences of Stanley Johnson, Herman Houston, Clifford Bolden and Johnny Armstrong are affirmed.

Reversed in part; affirmed in part.

LORENZ and MEJDA, JJ., concur.