THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT DOTSON, Defendant-Appellant.

First District (2nd Division) No. 1—87—1038

Opinion filed May 21, 1991.

638

Randolph N. Stone, Public Defender, of Chicago (Douglas Uhlinger and Alison Edwards, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and Paul Gliatta, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

A jury found defendant Robert Dotson guilty of murder and unlawful use of weapons. He was sentenced on the murder count to 40 years in the penitentiary. He appeals, asserting that reversal is necessary because (1) he was not proven guilty of murder and unlawful use of weapons beyond a reasonable doubt; (2) an incriminating statement was obtained from him in violation of his sixth amendment right to counsel; (3) he was deprived of a fair trial by the State's improper final argument; and (4) the trial court abused its discretion in sentencing him to 40 years' imprisonment.

At trial, the following evidence was presented. At approximately 1:50 a.m. on March 14, 1985, Chicago police officer John Kinnavy responded to a call directing him to the scene of a shooting at 140 North Wood in the Henry Horner housing projects. Upon arrival, he found the body of Fred Poe lying on the floor in the lobby area, across from the mailboxes. Kinnavy found no guns, shells, or other evidence in the area, nor could he locate any witnesses. It was stipulated that the medical examiner would testify that Poe had sustained two through-and-through gunshot wounds which entered his body from the back. The bullet which caused his death had perforated his lung.

Jeffrey Johnson testified that he and Terry Latham were with Poe when Poe was shot. They had entered the hallway of the building by the front entrance to drink beer and smoke marijuana. Johnson heard a back door open and took cover. He saw a head peek out from the back door. When Latham told the person to come out and identify

himself, there was no response. Poe said "Big Five" and the person responded "Fuck Big Five" and began shooting. As the shooter and a second man emerged, Latham ran out another door, and Poe ran in the same direction. Johnson ran out the front door and went home. When he learned what had happened to Poe, he went to the hospital and spoke with police.

Johnson explained that "Big Five" referred to the Vice Lords or the Stones street gang. Poe was a member of the Stones at the time of the shooting; Johnson was a member of the Vice Lords. Though he initially testified that he was not a member at the time of the shooting, he later asserted that he left the gang because he had been shot at and his "partner" Poe had been killed in this incident. The Vice Lords and Stones controlled or dominated the building in which Poe was shot.

Johnson could not see the faces of the two men who emerged from behind the door during the shooting. He did see that the shooter wore a baseball cap and was 5 feet 8 inches or 5 feet 9 inches tall. He did not see defendant during the shooting. Two days before the shooting, he had witnessed a bare-hands, boxing-like fight between Poe and defendant. At the end of the fight, defendant left and Poe spoke to a policeman who had arrived.

Tyrone Jackson was another State witness. He knew defendant, but was not a friend of his. He considered Fred Poe to be a friend and regarded Jeffrey Johnson as "like family." On March 14, 1985, at approximately 1:30 a.m., he was at home, but left to visit his girlfriend, Norma Jean, who lived three blocks from him at 140 North Wood. When he was about 20 feet from the building, he heard five gunshots coming from inside the building. Jackson continued toward the door and tried to pull it open but could not do so. He then pulled the door open with both hands and a man known as "Little Black Kenny" fell out. Jackson knew Little Black Kenny but was not a friend of his. Little Black Kenny was a member of the Disciples street gang, as was defendant.

When Little Black Kenny fell out of the door, he said, "Get the fuck out of here," and ran off across the parking lot. Jackson then walked straight ahead and came upon a second closed door. He opened the door and could hear someone moaning and mumbling. At this point, Jackson observed a person lying in the corner, but could not tell who it was. When he came closer, he realized that it was Fred Poe. Poe's chest was full of blood; he was bleeding from his wrist; and his eyes were big.

At this point, Jackson heard a noise and turned around. Michael Charles, a person he knew to be related to defendant, pointed a gun at his face. As Michael Charles "clicked" the gun, defendant, whose street name Jackson knew to be "Bay," said "Shoots [*sic*] the motherfucker. Let's get out of here." Michael Charles squeezed the trigger five times, but the gun did not fire. Defendant and Michael Charles then ran out a back door, different from the one Jackson had entered.

Jackson then knocked on the doors of the first-floor apartments in an attempt to get help, but no one answered. Although he knew many people in the building, he did not seek help on any other floor. He then exited through the back of the building. He saw no one, but heard noises. He ran home and went to sleep. The next morning, Jackson told his mother what he had seen and then went to speak to Officer William Freeman of the Chicago police department. That evening, he identified defendant and Michael Charles in a lineup.

Officer Freeman testified that Jackson told him that he knew who had killed Fred Poe, naming Robert Dotson, Michael Dotson, and Kennedy Blount, also called Black Kenny. Jackson did not tell him that Robert Dotson had said "shoot the motherfucker."

Also testifying concerning conversations with Jackson were Officer Charles Toussas, Detective John Thomas, and Assistant State's Attorney David King. King's written synopsis of what Jackson told him did not include the instruction to shoot. According to the synopsis, Jackson told him that defendant appeared at the door after the gun misfired, and the two men then left. Detective Thomas could not recall if Jackson told him that defendant had told Michael to shoot him and no such statement was in his report. Only Officer Toussas testified to Jackson having told him about defendant's statement, but Toussas neither wrote that statement down nor did he ever tell anyone else about it until trial. Jackson testified that he had related this statement to the authorities, specifically naming Officer Freeman, Officer Toussas, Assistant State's Attorney King, and the "detectives."

Officer Charles Toussas testified that on March 14, 1985, he arrested defendant in the 1900 block of West Washington after he saw defendant hand a revolver to a second person, who placed it in an open mailbox. The gun was recovered, as was a quantity of .32 caliber ammunition found on defendant. These items were introduced into evidence although none of them were linked to the shooting.

The first arrest of defendant resulted only in a charge of unlawful use of a weapon against him. On March 19, 1985, after his release on bond, Toussas asked Kennedy Blount to call defendant's home while, with Blount's permission, Toussas listened on a second phone. A

woman answered and Blount asked for defendant, who then came on the line. Blount stated, "What's up? They got me down in the police station for killing Freddie." Defendant replied, "Don't say nothing. Don't tell 'em nothing. They can hold you two, three days, and then they got to let you go. They got no witnesses." Defendant also stated "Don't tell them anything about what we did." Following the phone call, Toussas went to the 1700 block of North Francisco and placed defendant under arrest for the murder of Fred Poe.

Norma Jean Jones, identified by Tyrone Jackson as his girlfriend at the time of the shooting, testified for defendant and directly contradicted Jackson's account of having witnessed the aftermath of the shooting. She testified that on the night in question, Jackson was in her apartment on the 17th floor of the 140 North Wood building. In the early morning hours while watching television, she heard five shots coming from the front of the building. Jackson wanted to go down but she would not allow him to do so. She also testified that her sister Arlene had been Jackson's girlfriend.

Arlene Jones testified that she had been Jackson's girlfriend and was with him at Norma Jean's apartment until about 11 p.m. on the night of the shooting. He took her home and told her he was returning to Norma Jean's apartment. The next afternoon, he told her that he had been at Norma Jean's when Poe was shot and that Norma Jean would not let him out the door.

Both sisters admitted that a defense investigator's report of what they had told him contained two statements contradicting aspects of their trial testimony. The written statement which Norma Jean signed stated that the shots woke her up. The statement Arlene signed contained a crossed-out portion stating that on the 14th, Jackson had told her he knew who had done the shooting. Arlene testified that she had crossed out that portion because it was not true. The statement, however, also said that Jackson told her he was at Norma Jean's and she would not let him out. This portion of the statement was not crossed out.

The defense investigator, Carlton Williams, testified that he spoke to these two women without taking notes. He prepared the statements later and was mistaken when he attributed to them the two statements they repudiated at trial. When he later showed the statement to Arlene, she crossed out the erroneous statement and inserted the corrected paragraph.

The jury returned guilty verdicts for murder and unlawful use of weapons. The trial court denied defendant's motion for a new trial and sentenced him to 40 years on the murder conviction. No sentence

was imposed on the weapons charge because the trial judge ruled that it merged with the murder conviction. Defendant appeals from the judgment.

## I

Defendant initially contends that the State failed to prove him guilty of murder and unlawful use of weapons beyond a reasonable doubt. The State maintains that the evidence which was presented at trial provided ample support for defendant's murder conviction. The State further argues that because no judgment or sentence was entered on the unlawful use of weapons charge, that portion of the conviction is not appealable.

■ The standard to be applied by a reviewing court considering a challenge to the sufficiency of the evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.

■ A person is legally accountable for the actions of another when either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense. Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).

■ To be accountable for the acts of another, one must have a specific intent to promote or facilitate the commission of a crime. (*People v. Ramirez* (1968), 93 Ill. App. 2d 404, 236 N.E.2d 284.) However, words of agreement need not be adduced at trial. The jury may infer an agreement from the conduct of the accused in attaching himself to a group which combines to act in circumstances showing a common design to do an unlawful act to which all assent. (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.) *Bolden* is analogous to the case at bar. In that case, the court stated that while there was no evidence as to who actually wounded the victim, there was sufficient evidence from which the jury could believe that as a member of the group, defendant lent aid and assistance. *Bolden*, 59 Ill. App. 3d at 450.

■ A similar situation is presented in the instant case, where defendant was observed with his brother Michael Charles and cousin Blount at the scene. Furthermore, his statement of "Shoots [*sic*] the motherfucker. Let's get out of here," is clearly indicative of aid and solicitation. Also noteworthy is that defendant was present at the scene of the crime, was free to leave the area or seek aid from others,

but did nothing to disassociate himself from the occurrence. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.) It is the jury's function to draw conclusions based on the evidence and to decide whether there is a reasonable doubt as to defendant's guilt. (*Young*, 128 Ill. 2d 1.) In applying the appropriate standard, we cannot say that the jury could not properly determine that the essential elements of murder had been proven beyond a reasonable doubt.

■ Concerning the unlawful use of weapons charge, the State's position regarding appealability is correct. There is no final judgment in a criminal case until the imposition of sentence, and, in the absence of a final judgment, an appeal cannot be entertained. (*People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481.) The trial judge explicitly stated that the weapons charge would merge with the murder charge and that no sentence would be entered on it. Thus, there is no appealable judgment with respect to that charge.

## II

Defendant's next contention is that he was denied a fair trial when the State introduced an incriminating statement allegedly obtained from him in violation of his sixth amendment right to counsel. Specifically, defendant refers to the telephone call made by Kennedy Blount while Officer Toussas listened on a second phone. The State argues that defendant has waived this issue because he failed to allege it with adequate specificity in his post-trial motion. Although the State is correct that defendant has not challenged the telephone conversation specifically on sixth amendment right to counsel grounds, we shall consider the issue to determine whether plain error exists. 134 Ill. 2d R. 615(a).

■ Defendant argues that when he was charged with unlawful use of weapons, his sixth amendment right to counsel attached. In felony cases, the sixth amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38.) In *Scott v. Illinois* (1979), 440 U.S. 367, 59 L. Ed. 2d 383, 99 S. Ct. 1158, the United States Supreme Court adopted an actual imprisonment test to determine whether a defendant's sixth amendment right to counsel exists in misdemeanor cases. In *People v. Lynn* (1984), 102 Ill. 2d 267, 464 N.E.2d 1031, our supreme court stated that an indigent defendant's right to appointed counsel is not absolute when he is charged with a misdemeanor.

Nevertheless, defendant argues that his sixth amendment right to counsel had attached with regard to the unlawful use of weapons

charge and that that offense was so closely related to the murder charge that the right extended to any questioning about the murder. Indeed, the Illinois Supreme Court has held that the sixth amendment rights of one who has been formally charged with an offense extend to other offenses which are closely related to the charged offense and for which defendant is subsequently formally accused. *People v. Clankie* (1988), 124 Ill. 2d 456, 530 N.E.2d 448.

■ However, defendant's argument must be rejected for either of two reasons: (1) he has not established any sixth amendment right to counsel for the misdemeanor weapons charge; and (2) assuming *arguendo* that he had a right to counsel for that charge, a close relationship between that charge and the murder charge has not been established.

In *Clankie*, defendant had already been indicted for two burglaries of a home when the State surreptitiously tape-recorded his statements in which he implicated himself in a later burglary of the same home. The court, in applying the rationale of the United States Supreme Court in *Maine v. Moulton* (1985), 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477, found that these offenses were so closely related that the right to counsel extended to the later charge. (*Clankie*, 124 Ill. 2d at 463.) In the instant case, no such relationship exists. Defendant was arrested for unlawful use of weapons on March 14, 1985. The call placed by Kennedy Blount was made on March 19, 1985. No weapon or ammunition was ever recovered from the scene of the shooting. Thus, the two offenses in the instant case lack the close relationship necessary for the *Clankie* analysis to apply.

Defendant also relies upon *People v. Hoskins* (1988), 168 Ill. App. 3d 904, 523 N.E.2d 80, for authority that the two offenses are so closely related that the sixth amendment right to counsel renders his statement inadmissible. His reliance on *Hoskins* is misplaced, however. In that case, the court found that the two offenses arose out of the same underlying situation; defendant confessed to murder after he had been formally charged with aggravated battery of the same victim, who subsequently died. There is no evidence in the case at bar that the two offenses arose out of the same underlying offense, and thus, *Hoskins* is inapplicable.

Although defendant insists that application of *Maine v. Moulton* (1985), 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477, renders his statement inadmissible, his interpretation of that case is incorrect. The evil which the United States Supreme Court sought to avoid in *Moulton* was the use of a defendant's incriminating statement against him for the offense with which he had been charged and for which

sixth amendment rights had attached. The Court specifically held, however, that statements regarding other crimes were not rendered inadmissible simply because sixth amendment rights had attached to other charges. In the instant case, when the call was placed, defendant had been charged with unlawful use of weapons, not with murder. Defendant's contention that any questioning about the murder was prohibited is contrary to *Moulton*.

■ In support of his argument, defendant points out that the two charges were tried together. Though that is true, it is unrelated to the question of whether the offenses were sufficiently related for sixth amendment purposes. We conclude that the two offenses were not so closely related that any sixth amendment right which may have existed as to the weapon charge extended to the murder charge.

### III

Defendant next contends that he was deprived of a fair trial when the State allegedly made a prejudicial and improper final argument.

■ A prosecutor has wide latitude in closing argument, and the trial court's determination of the propriety of that argument will not be disturbed absent a clear abuse of discretion or substantial prejudice to the defendant. Where allegedly improper comments do not constitute a material factor in the conviction, or where they are of such minor character that prejudice to the defendant is not their probable result, the verdict will not be disturbed on appeal. *People v. Neumann* (1986), 148 Ill. App. 3d 362, 373-74, 499 N.E.2d 487.

■ Defendant argues that the State repeatedly misstated and distorted the evidence. Specifically, he contends that the prosecution misstated the evidence concerning the fight which occurred on March 12, 1985, between Fred Poe and defendant. He argues that the State, in the absence of any evidence, repeatedly told the jury that Poe had won the fight, thus providing a motive for defendant to kill him. The prosecutor has a right to comment on the evidence and to draw any legitimate inferences, even if the inferences may be to the detriment of the defendant. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.) The prosecutor's comments about the fight were within the bounds of permissible inference.

■ Defendant also alleges as error that the prosecution impermissibly attacked him as a "punk" and an "animal," referred to defense counsel as "desperate," and said that Tyrone Jackson had been called "everything from scum to shit." A prosecutor's reference to a defense as desperate has not been found to be plain error. (*People v. Husted* (1981), 97 Ill. App. 3d 160, 422 N.E.2d 962.) Though we decry

the use of invective, especially the use of a word such as "shit" when it was not part of the evidence, we do not believe that the verdict would have been different if these comments were not made.

The next instance in which defendant alleges that the People misstated the evidence concerns Tyrone Jackson's testimony that as Michael Dotson held him at gunpoint, defendant stated "Shoots [sic] the motherfucker. Let's get out of here." Defendant contends that the State misstated the evidence when it argued:

" 'Kill the motherfucker, too, and let us go'. What does that show you, ladies and gentlemen? Kill the motherfucker, too. Does that show you they knew a little bit about who killed Freddy Poe?" (Emphasis added.)

 The State contends that defendant has waived this assertion of error because, not only did he fail to allege it in the post-trial motion, he also failed to object to the comments during closing argument. Though the quoted argument does distort defendant's statement, we do not believe it rises to the level of plain error. We note, moreover, that the jury was instructed by the trial court to base its verdict only upon the evidence. We have considered defendant's other allegations of error concerning the State's closing argument and find them without merit.

## IV

Defendant's final contention is that the trial court abused its discretion in sentencing defendant to 40 years in the penitentiary. The State maintains that the trial court in no way abused its discretion where the sentence was properly based on the circumstances of the crime and the factors in aggravation and mitigation.

 The trial court is normally the proper forum in which a suitable sentence is to be determined, and the trial judge's decisions in regard to sentencing are entitled to great deference and weight. Absent an abuse of discretion by the trial court, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The reviewing court will find an abuse of discretion "only if the judgment of the trial court is manifestly unjust or palpably erroneous." (*People v. Anderson* (1986), 112 Ill. 2d 39, 46, 490 N.E.2d 1263.) In the instant case, it cannot be said that the judgment of the trial court was either manifestly unjust or palpably erroneous.

 The trial judge based his sentence on the nature and circumstances of the offense. He expressed concern that this was a gang-related murder and stated that "a sentence that is much more than the minimum is necessary to deter such conduct which is a blight on soci-

ety and in particular to the project buildings of this city." The trial judge took into consideration not only defendant's role in Poe's murder, but also the fact that defendant encouraged his brother to kill a witness, Tyrone Jackson. In rejecting the State's requested sentence of life imprisonment, the judge considered that defendant was 17 years of age at the time of the offense and that he lacked substantial criminal background.

Defendant's reliance on *People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606, is misplaced. In *Steffens*, the defendant was a juvenile at the time of the offense and had only a prior juvenile adjudication for burglary. Here, defendant was 17 years old and had a prior juvenile adjudication for unlawful use of weapons. We find no abuse of discretion in the trial court's sentence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SCARIANO, P.J., and HARTMAN, J., concur.